DAVE FISCHBEIN MANUFACTURING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVE FISCHBEIN COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1453–70, 1455–70. Filed November 27, 1972.

*Robert H. Aland* and *Robert J. Cunningham,* for the petitioners.
*Jay B. Kelly,* for the respondent.

IRWIN, *Judge:* These cases involve deficiencies in income tax asserted by respondent for petitioners' taxable years as follows:

| DAVE FISCHBEIN MANUFACTURING CO. Docket No. 1453–70 | | DAVE FISCHBEIN CO. Docket No. 1455–70 | |
|---|---|---|---|
| TYE | Deficiency | TYE | Deficiency |
| 6/30/65 | $2,450.40 | 2/28/63 | $8,955.94 |
| 6/30/66 | 2,400.00 | 2/29/64 | 18,400.18 |
| 6/30/67 | 5,280.00 | 2/28/65 | 59,187.00 |
|  |  | 2/28/66 | 58,839.13 |
|  |  | 2/28/67 | 61,343.34 |

The parties have reached settlement with respect to three of the initial issues involved in docket No. 1455–70. Irrespective of our further disposition of the remaining issues with regard to Dave Fischbein Co., a Rule 50 computation will be required.

The issues remaining for our decision are: (1) Whether salaries paid by both petitioners in 1965, 1966, and 1967 to Dave Fischbein,

founder and chief executive officer of petitioners, were reasonable, in whole or in part; and (2) whether Dave Fischbein Co. must include in its income for 1964 through 1967 under section 951(a)(1)(A)(i)[1] of the Code, certain income earned in the years 1963 through 1966 by its Belgian subsidiary, Compagnie Fischbein, S.A., from the sale of bag-closing machines on the basis that such income constituted "subpart F" income of the variety defined in section 954(d)(1) as "foreign base company sales income." The former compensation issue has been litigated many times before our Court. The particular subpart F issue involved here, on the other hand, is a matter of first impression before the Tax Court.

### FINDINGS OF FACT

### *Background and Facts Re Reasonable Compensation*

Petitioner Dave Fischbein Manufacturing Co. (hereafter DFMC) is a Minnesota corporation with its principal offices during the taxable years in question and at the time it filed its petition with the Tax Court in this case in Minneapolis, Minn. DFMC filed its Federal income tax returns for the fiscal years ended June 30, 1965 (1965), June 30, 1966 (1966), and June 30, 1967 (1967), on the accrual method of accounting with the district director of internal revenue, St. Paul, Minn.

Petitioner Dave Fischbein Co. (hereafter DFC) is a Minnesota corporation with its principal offices during the taxable years in question and at the time it filed its petition with the Tax Court in this case in Minneapolis, Minn. DFC filed its Federal income tax returns for the fiscal years ended February 28, 1963 (1963), February 29, 1964 (1964), February 28, 1965 (1965), February 28, 1966 (1966), and February 28, 1967 (1967), on the accrual method of accounting with the district director of internal revenue, St. Paul, Minn.

DFMC is engaged in the manufacture of bag-closing equipment, including sewing machines and related items. DFMC sells this equipment exclusively to DFC and to Dave Fischbein Westhem Sales Corp., discussed *infra*. DFMC also sells many of the component parts for such bag-closing equipment to a wholly owned Belgian subsidiary of DFC known as Compagnie Fischbein, S.A. (hereafter CFSA).

DFC is engaged in the sale and service of bag-closing equipment and related items purchased from DFMC to unrelated customers primarily in the United States but also abroad in some cases.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

A bag-closing machine is a type of sewing machine used to close the mouth of an open bag. These machines are used in the animal feed, seed, fertilizer, food-processing, and other industries.

David Fischbein (hereafter Dave) was born in Odessa, Russia, in 1883. He immigrated to the United States with his mother and his brothers and sisters in about 1888 when he was 5 years of age. The family made its home in Minneapolis, Minn. In 1906 Dave married the former Clara Wold (hereafter Clara), and they made their home in St. Paul.

During the period 1934 through 1943, Dave and his son, Harold, operated a business under the name of "Dave Fischbein Company," a partnership, the business of which related to repairing industrial sewing machines and selling rebuilt industrial sewing machines.

In 1943, Dave made a decision to design a small bag-closing machine and, with some assistance from Harold, began to work on the project. In 1945, the chaining mechanism essential to a workable machine was perfected. The patent of the idea of a portable electric sewing machine was applied for by Dave in 1945 and issued in 1949. In 1946, Dave applied for two more patents covering the throat plate and work-feed dog parts of the portable electric sewing machine which were later received.

The portable electric sewing machine designed for bag-closing operations was designated model A and introduced to the market at a feed trade show held in Minneapolis in February 1946. Actual deliveries of the model A machines were not begun until February 1947.

In 1947 a slight mechanical design change in the model A machine was made. The machine, with this new improvement incorporated therein, was then redesignated as the model B bag-closing machine.

The trade was ready for an electric portable bag-closing machine and the machine was an immediate success. The Fischbein machine was the first of its kind on the market and at this time, 1947, there was no competition.

DFMC was incorporated on July 1, 1947, for the purpose of taking over the new manufacturing portion of the partnership business. The portable bag-closing machines manufactured by DFMC were to be sold only to DFC which was incorporated on the same day. The authorized capital stock of DFMC at the time of incorporation consisted of 250 shares of common stock with a par value of $100 per share. Dave and Harold were each issued 50 shares. However, on July 1, 1947, Dave transferred his shares of DFMC stock to Clara. By the end of 1960, she had disposed of all of these shares. Thereafter, neither Dave nor Clara owned any stock of DFMC.

Dave was DFMC's first president; Clara its first vice president; and Harold its first secretary and treasurer. The initial board of directors consisted of Dave, Clara, and Harold.

In July 1956 Harold was elected to the office of executive vice president while continuing as treasurer. George, Dave's youngest son, was elected secretary. Dave and Clara continued as president and vice president, respectively. In January 1963 Harold was elected vice president, relinquishing the office of executive vice president which thereafter remained vacant.

In January 1964 Dave was elected chairman of the board of directors of DFMC. The new officers were Harold, president; George, vice president and treasurer; and Sam Shark (Sam), Dave's son-in-law, secretary.

During January 1963 George had been elected as a director of DFMC to replace Clara, who had resigned. In January 1965 Sam was elected a director of DFMC. Dave, Harold, George, and Sam continued to serve as directors of DFMC until Dave's death on April 1, 1969.

At the first meeting of DFMC's board of directors held on July 1, 1947, Dave's and Harold's salaries were established at $200 per week. Dave's and Harold's salaries continued at this level until July 1953, at which time their salaries were increased to $400 per week, effective for the fiscal year ending June 30, 1954, at a special meeting of the board of directors held on July 7, 1953.

Dave's salary continued at the level of $400 per week until the date of his death on April 1, 1969. Harold's salary has continued at the rate of $400 per week to the date of trial.

At a special meeting of the board of directors held on July 3, 1956, George's salary as the new secretary was set at $300 per week, effective for the year ending June 30, 1957. At a special meeting of the board of directors held on July 6, 1965, Sam's salary as the new secretary was set at $100 per week, effective for the fiscal year ending June 30, 1966, and has continued at this rate to the date of trial. At a special meeting of the board of directors held on June 28, 1966, bonuses of $3,000 were awarded to Harold, George, and Sam for the year ended June 30, 1966. At a special meeting of the board of directors held on July 5, 1966, George's salary was increased to $325 per week, effective for the fiscal year ending June 30, 1967, and has continued at this level to the date of trial. Clara received no compensation as an officer of DFMC.

DFC was incorporated on July 1, 1947, for the purpose of buying and selling new and used sewing machines and allied equipment; re-

pairing, rebuilding, and servicing such equipment; and also for the purpose of selling bag-closing machines manufactured by DFMC. The authorized capital stock at the time of incorporation consisted of 250 shares of common stock with a par value of $100 per share. Dave and Harold were each issued 50 shares. On July 1, 1947, Dave transferred his 50 shares to Clara. By the end of 1959, Clara had disposed of all of her shares in DFC. Thereafter, neither Dave nor Clara owned any stock of DFC.

Dave was DFC's first president; Clara its first vice president; and Harold its first secretary-treasurer. The initial DFC board of directors consisted of Dave, Clara, and Harold.

In January 1956 Harold was elected executive vice president while also continuing as treasurer, and George was elected secretary. In January 1964 Harold was elected vice president, relinquishing the office of executive vice president, which remained vacant thereafter.

Clara died on May 12, 1963. The following June, George was elected to a directorship to fill the vacancy caused by Clara's death.

At the first meeting of DFC's board of directors held on July 1, 1947, Dave's and Harold's salaries were established at $200 per week. Dave's and Harold's salaries continued at this level until March 1950, at which time their salaries were increased to $15,400 per year (approximately $300 per week), effective for the fiscal year ending February 28, 1951, at a special meeting of the board of directors held on March 2, 1950.

Dave's and Harold's salaries continued at the rate of $15,400 per year until March 1953, at which time their salaries were reduced to the previous level of $200 per week, effective for the fiscal year ending February 28, 1954. At a special meeting of the board of directors of DFC held on January 8, 1954, bonuses of $10,000 each were paid to Dave and Harold.

At a special meeting of the board of directors of DFC held on March 3, 1954, the salaries of Dave and Harold were increased to $400 per week, effective for the fiscal year ending February 28, 1955.

Again, at a special meeting of the board of directors of DFC held on March 5, 1956, Harold's salary was increased to $450 per week, and George's salary as the new secretary was set at $300 per week, both effective for the fiscal year ending February 28, 1957.

Dave's salary continued at the level of $400 per week until the date of his death on April 1, 1969. Harold's salary continued at the rate of $450 per week to the date of trial.

At a special meeting of the board of directors of DFC held on March 5, 1965, Sam's salary as the new secretary was set at $100 per week, effective for the fiscal year ending February 28, 1966, and has

continued at this level to the date of trial. At a special meeting of the board of directors of DFC held on March 4, 1966, George's salary was increased to $325 per week, effective for the fiscal year ending February 28, 1967, and has continued at this level to the date of trial. Clara received no compensation as an officer of DFC.

In the early 1950's Clara and Dave began to spend most of the winter months each year in California. In 1956 Clara and Dave decided that they preferred Florida over California as a place to spend the winter months. They purchased a home in Miami Beach, Fla., and they spent the winter months in that home from 1956 to the time of Clara's death in May 1963. The family home in Florida was sold in 1964.

On September 19, 1962, Dave suffered an insufficiency of the basilar-carotid arteries, generally referred to in laymen's terms as a "stroke." After Clara's death in May 1963 Dave lived, until the date of his death, with his daughter and son-in-law, Lorraine and Sam, when he was in Minneapolis.

Dave spent the winters after suffering his stroke in the following places:

| From | To | Place |
| --- | --- | --- |
| Fall 1962 | Spring 1963 | Minneapolis |
| Fall 1963 | Spring 1964 | Dave's home, Miami Beach, Fla. |
| 12/1/64 | 2/27/65 | Samaritan Nursing Home, Hollywood, Fla. |
| 11/25/65 | 5/6/66 | Coral Pines Nursing Home (now Alden House), Fort Lauderdale, Fla. |
| 11/19/66 | 3/31/67 | Alden House, Fort Lauderdale, Fla. |
| Fall 1967 | Spring 1968 | With sister-in-law, Blossom Gilinsky, Encino, Calif. |
| 11/2/68 | 2/24/69 | Alden House, Fort Lauderdale, Fla. |

Dave died on April 1, 1969, at the age of 86.

Dave spent his winters in nursing homes or with relatives in order to have someone around to perform his basic housekeeping and meal needs. He was alone following his wife's death. At Alden House Dave was not restricted in any fashion; he could come and go as he pleased. His ground floor room there included a private bath, patio, telephone, and television.

At a special meeting of the board of directors of DFC held on March 10, 1964, Dave relinquished his position as president of that corporation that he had held since 1947 and was elected to the position of chairman of the board. The minutes of that meeting state:

The chairman [Dave] stated that this meeting was called primarily to consider the propriety of establishing a new position to be known as "Chairman of

the Board." The chairman stated that he had been conferring with the other members of the Board of Directors and with the stockholders of the corporation, and he stated that in view of his advanced age, he felt that he ought to turn over the active management to a younger person who possessed more vitality than he did. He stated that he did not want to give up any of his responsibilities in connection with the management of the corporation but he felt that he could well serve the corporation in a capacity different from president by serving it as Chairman of the Board of Directors.

At the annual meeting of the board of directors of DFMC held on January 20, 1964, Dave relinquished his position as president of the corporation that he had held since 1947 and was elected to the position of chairman of the board. The minutes of that meeting state:

The chairman [Dave] stated that he had long given some thought to turning over the active management of the company to a younger man and he felt that in view of his advanced age, it is unfair to have him continue as president of the corporation. The chairman stated that he was not desirous of retiring but that he felt he could continue in active participation in the management of the company in a different capacity than as president of the company. * * *

Dave Fischbein originated and patented the idea of a portable bag-closing machine and he was the driving force and primary reason for the success of Dave Fischbein Co. (prior to and following its incorporation) and Dave Fischbein Manufacturing Co. Prior to the incorporation of DFC and DFMC in 1947, which was designed to separate somewhat disparate ends of the business, Dave's daily work regimen consisted of long hours and much physical labor.

From 1947 until the time of his 1962 illness, Dave's energies were devoted to performance of his executive and administrative duties as chief executive officer of his two companies.

The illness suffered in 1962 slowed Dave's walk and affected his speech. After 5 to 6 weeks of recovery, Dave returned to his duties, but his health and age necessarily decreased the energy and hours he previously exerted.

The annual meetings of the boards of directors of DFC and DFMC in 1964 and the changes made (creation of the position of chairman of the board and Dave's election thereto in both corporations) reflect Dave's changing but continuing responsible role in his very successful companies.

Still, no important decision was ever made without his prior approval. He maintained his office in the plant and when in Minneapolis he came to the plant to discharge his duties as chairman and review his correspondence every day except on those days when the weather was exceptionally bad. He reviewed sales figures. He participated in meetings of the boards of directors and other business meetings. Dave also continued to observe operations in the factory during this period,

making suggestions for improvements in the factory operations where appropriate.

The morale influence that Dave had upon the officers and employees of DFC and DFMC in the 1962–69 years was even more important and pervasive than in prior years. The employees, many of whom had been with Dave for 20 years or more, had strong personal feelings and respect for Dave; and his mere presence increased this respect and bolstered their morale.

The total annual salaries paid by DFC and DFMC to Dave (chairman of the board), Harold (president), George (vice president and treasurer), and Sam (secretary) in 1965, 1966, and 1967 were as follows:

| | DFC | | | DFMC | | |
|---|---|---|---|---|---|---|
| | 1965 | 1966 | 1967 | 1965 | 1966 | 1967 |
| Dave | $20,800 | $20,880 | $20,800 | $20,880 | $20,480 | $21,280 |
| Harold | 23,400 | 23,490 | 23,400 | 20,880 | 23,480 | 21,280 |
| George | 15,600 | 15,660 | 16,900 | 15,660 | 18,360 | 17,265 |
| Sam | None | 5,200 | 5,200 | None | 8,200 | 5,200 |
| Total | 59,800 | 65,230 | 66,300 | 57,420 | 70,520 | 65,025 |

Respondent disallowed all of the salaries paid to Dave by DFC in each of the 3 years and determined that in the case of salaries paid by DFMC that a reasonable allowance would be $15,880, $15,480, and $10,280 for 1965, 1966, and 1967, respectively.

### Facts Re Subpart F Issue

On January 2, 1952, Dave Fischbein Westhem Sales Corp. (hereinafter DFWSC) was organized under the laws of the State of Minnesota for the purpose of selling bag closers manufactured by DFMC in the Latin American countries.

In 1949 the model B bag-closing machine was redesigned as the model C as a result of certain design and mechanical changes and improvements.

In 1960 the model D bag-closing machine was introduced to the market. The improvement incorporated in the model D over the model C was a jam-proof looper mechanism. Harold and George obtained a patent covering this mechanism.

On March 1, 1956, DFC organized a wholly owned subsidiary, Compagnie Fischbein, S.A. (hereinafter CFSA), under the laws of Belgium to sell Fischbein bag closers throughout the world. The initial officers of CFSA were as follows:

| | |
|---|---|
| Dave | President |
| Harold | Vice president |
| Olivier Van Lerberghe | Managing director |

In April 1957 Van Lerberghe resigned as managing director of CFSA, and Joseph Foulon was named as manager to assume Van Lerberghe's duties.

At the time CFSA was organized it was decided that CFSA would purchase the component parts for bag-closing machines from DFMC and from unrelated suppliers in Belgium rather than purchasing finished machines from DFMC. This decision was based upon two primary reasons. First, it was important that the machines sold by CFSA be of Belgian origin so that they would qualify for Belgian certificates of origin. This was important from the standpoint of tariffs, quantity restrictions, and similar measures in the Common Market. Second, it was cheaper for CFSA to complete its own finished machines in Belgium because of the lower labor and overhead costs in Belgium.

In 1946, CFSA's first year of operations, it had eight employees, including six mechanics (one of whom left during the year) and including Van Lerberghe (later replaced by Foulon). In 1963 through 1966 CFSA had the following number of employees:

| Year | Office | Mechanics | Total |
|---|---|---|---|
| 1963 | 2 | 7 | 9 |
| 1964 | 2 | 8 | 10 |
| 1965 | 2 | 9 | 11 |
| 1966 | 2 | 8 | 10 |

The names of the mechanics employed by CFSA and the years in which they were employed during the period from 1963 through 1966, and their prior training or experience were as follows:

| Name | Years of employment | Years of Training | Experience |
|---|---|---|---|
| R. Dekoster | 1963, 1964, 1965, 1966 | 4 | 20 |
| G. Thierron | 1963, 1964, 1965, 1966 | 5 | 10 |
| H. Bardiaux | 1963, 1964, 1965, 1966 | | 30 |
| R. Desmet | 1963, 1964, 1965, 1966 | 4 | 2 |
| D. DeVlegelaere | 1963, 1964, 1965 | 3 | |
| M. DeGezelle | 1963, 1964, 1965, 1966 | 4 | |
| M. Desmet | 1963, 1964, 1965, 1966 | 3 | 6 |
| F. Gosselin | 1964, 1965 | 3 | |
| R. DeBruyn | 1965, 1966 | 3 | 5 |
| C. Vanderstuyft | 1966 | 3 | |

In 1956 CFSA was located in Etterbeck, Belgium, a suburb of Brussels in space consisting of three rooms, each approximately 15 feet by 20 feet in size. One room was used as an office, one as the packing and shipping room, and the third as the work area.

In April 1957 CFSA moved to a new two-story building which provided approximately 3,000 square feet of space.

On September 15, 1965, CFSA moved to its present building which contains approximately 8,500 square feet, which was purchased by DFC for $98,000 and leased to CFSA at a rental of $8,400 per year.

The types of bag-closing machines sold by CFSA in its 1963 through 1967 years were the models C and D and variations thereof, as well as accessories therefor. The number of models C and D and variations thereof sold by CFSA in these years were as follows:

| NTA-6 | BTA-8 | PTA | BTA-6 | DBA | Model D | Model C | BA-8 | B-8 | PBA | NA-6 | FS-4 | PB | CH | DH | DB | DR | FS | U-N-6 | AS-D | FS-4D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 3 | 5 | | | 1703 | 282 | 12 | 12 | 6 | 1 | 1 | 1 | 6 | 7 | 1 | 1 | 1 | | | 1 |
| | 5 | 6 | 1 | | 1846 | 173 | 10 | 6 | 10 | | | 9 | 8 | 6 | 2 | | | | | 1 |
| | 10 | 4 | | | 2118 | 183 | 6 | 10 | 8 | | 1 | 3 | 3 | 6 | 1 | 2 | | 1 | | 1 |
| 1 | 14 | 12 | | 1 | 2406 | 147 | 4 | 9 | 3 | | | 6 | 3 | 16 | 2 | 1 | | | 1 | 1 |
| | | | | | 2435 | 100 | 1 | 11 | 1 | | | 5 | 10 | 11 | | | | | | |

CFSA's gross sales for 1963 through 1966, on a country-by-country basis, were as follows (in Belgian francs to United States dollars at 50:1 conversion ratio):

| Country | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|
| Belgium | $26,344.11 | $27,302.25 | $30,036.67 | $38,515.36 |
| Holland | 5,866.29 | 7,773.85 | 4,090.04 | 8,999.84 |
| England | 60,998.79 | 63,707.78 | 80,002.94 | 83,755.87 |
| Germany | 100,007.33 | 106,570.51 | 116,426.41 | 109,181.01 |
| France | 83,879.65 | 94,570.80 | 97,499.68 | 102,341.35 |
| Portugal | 6,949.33 | 9,787.31 | 7,924.49 | 7,723.81 |
| Italy | 51,763.95 | 55,652.61 | 35,583.02 | 63,561.42 |
| Yugoslavia | 6,643.25 | 2,330.67 | 1,741.05 | 4,456.23 |
| Spain | 56,304.20 | 58,956.82 | 74,697.89 | 82,720.44 |
| Denmark | 23,405.25 | 28,736.33 | 28,725.53 | 27,348.85 |
| Norway | 6,843.00 | 8,056.46 | 11,906.03 | 16,461.15 |
| Sweden | 9,824.10 | 9,503.16 | 13,914.63 | 11,083.99 |
| Finland | 3,367.92 | 5,719.99 | 8,640.28 | 10,997.18 |
| Iceland | 6,448.72 | 3,612.97 | 3,982.83 | 4,137.09 |
| Austria | 7,266.08 | 13,588.03 | 21,969.70 | 27,525.16 |
| Czechoslovakia | 920.17 | 1,240.06 | 894.33 | 1,127.63 |
| Israel | 9,710.16 | 6,369.03 | 10,452.12 | 7,613.48 |
| Angola | 10,616.51 | 11,375.80 | 9,918.53 | 17,108.52 |
| S. Africa | 22,249.77 | 23,557.82 | 31,036.60 | 28,670.57 |
| Australia | 11,593.57 | 11,496.88 | 8,695.83 | 13,238.78 |
| U.S.A. | 2,618.21 | 1,046.41 | 1,384.51 | 1,042.14 |
| Cyprus | 1,908.13 | 440.45 | 2,157.89 | 1,692.74 |
| Cameroon | 3,216.62 | 2,806.18 | 138.64 | 571.35 |
| Pakistan | 750.42 | 2,205.47 | 203.37 | 1,494.87 |
| Brazil | 8,973.55 | 6,729.18 | 5,730.31 | 17,634.52 |
| Kenya | 551.98 | 113.10 | 196.80 | 605.14 |
| Greece | 1,119.87 | 7,045.80 | 1,452.88 | 5,900.48 |
| Poland | | 470.65 | 2,590.12 | 5,803.73 |
| Lebanon | 1,821.51 | 2,874.19 | 4,900.65 | 3,342.95 |
| Romania | | 1,763.09 | 28,171.73 | 5,323.47 |
| Congo | | 507.79 | 242.39 | 616.19 |
| Kuwait | | 309.30 | | 189.83 |
| Gibraltar | 868.27 | 150.04 | 96.26 | |
| Senegal | | 5.61 | | |
| New Guinea | | 736.24 | 601.12 | 2,947.08 |
| Hungary | 397.04 | 203.00 | 403.17 | 454.59 |
| Mozambique | 404.00 | 555.96 | 426.33 | 462.35 |
| Morocco | | 461.54 | 978.72 | 511.14 |
| Thailand | | 25.13 | 522.95 | |
| Canary Islands | 354.28 | 2,224.51 | 1,074.56 | 3,533.34 |
| Iraq | | 605.93 | 1,184.69 | 793.33 |
| Reunion | | 379.46 | | |
| Libya | | 86.24 | | |
| Turkey | 2,023.07 | 986.30 | 727.16 | 2,590.27 |
| Iran | 3,997.33 | | 75.31 | 10,951.32 |
| Ivory Coast | | | 655.66 | 46.81 |
| Nigeria | | | 1,326.70 | 749.62 |
| S. America (misc.) | | | 2,621.74 | |
| Ghana | | | 349.62 | |
| Colombia | | | | 969.68 |
| Argentina | | | | 5.13 |
| Madagascar | | | | 1,208.66 |
| S. Arabia | | | | 1,552.54 |
| Liberia | | | | 292.39 |
| India | 575.58 | | | |
| Martinque | 637.30 | | | |
| Egypt | 609.21 | | | |
| Other misc | | 280.06 | 152.88 | |
| Total | 541,828.52 | 582,920.76 | 656,504.71 | 737,853.40 |

Approximately 95 percent of CFSA's sales of bag-closing machines were to exclusive distributors in the various countries of Europe, Africa, and elsewhere. In turn, these distributors resold the machines to end users in their countries. Occasionally sales were made directly to end users in countries where CFSA had no distributors. Sales to the Eastern European countries were made directly to the governments of those countries.

CFSA promoted sales of its bag-closing machines by cooperating with its distributors in (a) participating in trade shows in Belgium, England, Germany, France, The Netherlands, and elsewhere; (b) advertising in local trade magazines; and (c) printing and mailing brochures to present and prospective end users. CFSA maintained no sales force.

The bag-closing machines sold by CFSA generally were serviced by the local distributors through whom they were sold to the end users. These distributors employed mechanics who were trained by CFSA's personnel either at CFSA's plant in Brussels or at the distributors' places of business. Moreover, CFSA provided its distributors with special repair kits for use in making repairs.

CFSA's pretax income, Belgian income tax paid, and effective tax rates for 1963 through 1966 were as follows:

|  | 1963 | 1964 | 1965 | 1966 |
|---|---|---|---|---|
| Net pretax income | $143,196 | $151,298 | $143,140 | $157,954 |
| Tax paid | $47,622 | $49,485 | $46,883 | $50,684 |
| Effective tax rate | 33.3% | 32.8% | 32.8% | 32.1% |

The parties agree that the sales of bag-closing machines by CFSA in the following countries during the years in question are excluded from any computation of how much potential "foreign base company sales income" is in issue before us: Belgium, Portugal, Italy, Yugoslavia, Spain, Norway, Iceland, Angola, South Africa, Cameroon, Brazil, Kenya, Lebanon, Romania, Congo, Kuwait, Gibraltar, Senegal, New Guinea, Mozambique, Canary Islands, Turkey, Colombia, Madagascar, Egypt.

By 1967 DFMC was the largest exclusive bag-closing manufacturer in the United States and throughout the world.

CFSA purchased most of the components of the bag-closing machines directly from DFMC. In 1956, CFSA began immediately to sell Fischbein bag-closing machines. CFSA also purchased from DFMC components for the accessories to the bag-closing machines and variations thereon, for example, components for the carriage and belt conveyors and various segments of the automatic features for the accessories.

Rather than purchase standard component parts such as screws, nuts, motors, belts, cord sets, needles, and switches from DFMC, which DFMC had to purchase from unrelated suppliers, CFSA purchased these parts from unrelated suppliers in Belgium. There were four main reasons for the purchase of certain component parts locally in Belgium. First, the Belgian government encouraged CFSA to use locally made products to the extent possible. In fact, CFSA also tried

to use Belgian air and shipping lines for parts and machines sent to or from Belgium. Second, many of the parts could be bought by CFSA at lower prices in Belgium than it could obtain them from DFMC. Third, as stated earlier the local purchase of these parts avoided certain customs difficulties. Fourth, since CFSA sold its bag-closing machines primarily in Europe, several components of CFSA's machines had to comply with European standards that could not be satisfied by American-made products. As an example of the latter situation, the plug on American-made cord sets would not fit in European electrical outlets. Similarly, many European countries required lower voltage motors (e.g., 24 or 42 volts) for safety reasons rather than the standard 110- and 220-volt motors in the United States.

In the years in question CFSA had in Brussels a fully equipped factory with all the tools and equipment necessary for it to turn the machines into finished products.

The tools and equipment of general usage included a drill press, air compressors, grinders, stroboscopes, helicoil tools, drills, rheostats, keys, spot facing equipment, screwdrivers, pliers, spanners, brushes, hammers, India stones, emery cloth, emery cord, nut drivers, transformers, ohm meters, amp meters, wire snips, and other items.

The equipment included tools designed to cut away material, align bushings, measure distances and fittings, and to adjust tension.

Except for the larger items of equipment such as the drill press, the various tools were located at the work stations of the individual mechanics. A work station consisted of a bench with compartments for the component parts of the bag-closing machines and a stool for the mechanic. Each work station had vises, and electric motor controlled by a rheostat, a spotlight, and all the other tools necessary to enable the mechanic to complete the segment of the assembly of completed machines assigned to him. A special work station was provided for electrical work (i.e., wiring of machines), and this work station was equipped with the electrical equipment required for that work.

The parts illustration of the sewing head and electric drive handle of the model D bag-closing machine shows that the completed machine consists of 198 different types of components parts. Because certain of these parts are used more than once during CFSA's assembly of the bag-closing machine, a total of 283 parts comprise the final product.

Most of these parts were received by CFSA from DFMC in fabricated form according to DFMC's blueprints for such parts. The mechanics at the CFSA plant in Brussels, in operations consisting of 58 different steps and averaging approximately 6 hours of combined workingtime, tailored these parts to each other in order to complete the assembly of a finished bag-closing machine. The tailoring process was required because many of the more sophisticated parts were not ready

for use in finished machines without additional mechanical work such as reaming, lapping, and mating. The 6-hour operation of completing the bag-closing machines included electrical testing of the machine and "time runs" in which each machine is tested at various speeds of operation.

Some of the components of the bag-closing machine, for example, the housing and handle of the machine, remain recognizable in the finished bag-closing machine which CFSA sells.

During the years 1963–67, inclusive, CFSA's operations did not account for 20 percent or more of the total cost of the bag-closing machines it sold.

### OPINION

### *Reasonable Compensation Issue*

Respondent has totally disallowed as deductions, the salaries paid by DFC and has disallowed in part those paid by DFMC to Dave in 1965, 1966, and 1967 in each instance. Section 162 of the Code provides:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

Section 1.162–7(b)(3), Income Tax Regs., provides that "In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances."

This reasonable-compensation issue is a question of fact to be determined on the basis of the facts and circumstances of each particular case. *Ben Perlmutter*, 44 T.C. 382 (1965), affd. 373 F. 2d 45 (C.A. 10, 1967).

Among the many factors to be analyzed with respect to this issue are the following: The individual's qualifications for his position; the nature, extent, and scope of his work; the size and complexities of the particular business; and the amount of compensation paid to the individual in previous years.

In the situation before us, we are presented the case of an individual whose initiative, inventiveness, and boundless energy were the primary reasons for the success of his company. Dave's salary from DFMC remained unchanged from July 1953 ($400 per week; approximately $20,800 per year) and his salary from DFC remained unchanged from March 1954 ($400 per week; approximatley $20,800 per year) until his death in 1969.

Until 1947 Dave's responsibilities consisted of much physical labor. Following the incorporation of the two businesses in 1947, his respon-

sibilities began to be directed more toward executive and administrative duties related to his very successful companies. His companies and the sewing machines they made were his creations. When bad health and advancing age began to take toll of him in 1962, he refused to retire. Despite more relaxation time spent in these post-1962 years in deference to these health considerations, he still maintained an office at the plant; worked regularly tending to his executive responsibilities except on days when the weather was exceptionally bad; participated in business meetings; continued to observe factory operations; maintained close contact in the plant with long-term employees; and continued to exude pride in his creations, thus establishing a high morale in his plants.

One very impressive consideration involved herein is that Dave's salary remained at a constant level from the 1953–54 years. The distinct impression is that he was more concerned about the success of his creations than about reaping a higher salary which an individual of his stature and expertise could command.

Based on the total record in this case, we think it clear that Dave rendered valuable executive services to his corporations during the years in question and that the salary paid him by each petitioned was reasonable and proper reflection of these valuable services actually rendered.

*Foreign Base Company Sales Income Issue*

Prior to the Revenue Act of 1962, the income of a foreign corporation, even if the corporation were controlled by a United States shareholder, was not subject in any way to United States tax on its income earned from sources without the United States unless the narrow, foreign personal holding company provisions (secs. 551–558) were applicable. This gave rise to the use of so-called tax haven countries wherein often only minimal business operations were carried on in order to insulate income from United States tax. United States tax was imposed on such income only when dividends were paid by the foreign corporation and received by the United States shareholder; and if such shareholder was a corporation, the tax could be reduced by a credit for foreign taxes paid by the foreign subsidiary. In other words although foreign income tax was paid currently United States tax was deferred until such income was repatriated as actual distributions made to the United States shareholder.

Although foreign corporations were not made subject to United States tax, Congress limited this tax-deferral privilege with the enactment of the Revenue Act of 1962, adding subpart F (secs. 951–964) to the Code to deal with the situation. The legislation defined a new

type of corporation—a "controlled foreign corporation"—as any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned, directly or indirectly, by "United States shareholders" on any day during the taxable year of the foreign corporation.[2] The term "United States shareholder" is defined to include a domestic corporation owning, directly or indirectly, 10 percent or more of the total combined voting power of all classes of stock entitled to vote of a foreign corporation.[3] CFSA and DFC are a "controlled foreign corporation" and a "United States shareholder," respectively, within these definitions.

If a foreign corporation is a "controlled foreign corporation" for an uninterrupted period of 30 days or more during a taxable year beginning after December 31, 1962, each "United States shareholder" owning stock in such corporation on the last day of such year must include in its gross income for its taxable year in which such taxable year of the corporation ends its pro rata share of the controlled foreign corporation's "subpart F income."[4]

The term "subpart F income," insofar as it is relevant in this case, is defined to include the controlled foreign corporation's "foreign base company income."[5] In turn, the Code defines "foreign base company income" to include the controlled foreign corporation's "foreign base company sales income."[6]

Section 954(d)(1) defines "foreign base company sales income" to include:

income * * * derived [by a controlled foreign corporation] in connection with the purchase of personal property from a related person [7] and its sale to any person * * * where—

    (A) the property which is purchased * * * is *manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized,* and

    (B) the property is sold for use, consumption, or disposition outside such foreign country * * * [8] [Emphasis supplied.]

In other words, sales by a controlled foreign corporation produce foreign base company sales income of this type only if they relate to goods which are produced, manufactured, grown, or extracted outside

---

[2] Sec. 957(a).
[3] Sec. 951(b).
[4] Sec. 951(a)(1)(A)(i).
[5] Sec. 952(a)(2).
[6] Sec. 954(a)(2).
[7] There is no dispute herein that DFMC is a "related person" to CFSA under the terms of sec. 954(d)(3)(B).
[8] CFSA sales to customers in Belgium, therefore, would not constitute foreign base company sales income.

the country in which the controlled foreign corporation is organized and are sold for use, consumption, or disposition outside that country.[9]

On the other hand, if the sales outside the foreign country relate to goods which are produced, manufactured, constructed, grown, or extracted *within* the country in which the controlled foreign corporation is organized, then such sales do not produce "foreign base company sales income." [10]

This particular alternative treatment for certain sales income generated by a controlled foreign corporation is developed exclusively in respondent's regulations and in the legislative history of subpart F.

Petitioner DFC argues herein that under the scheme of the Code, the regulations, and the legislative history of subpart F, the operations of CFSA amount to production, manufacture, or construction of bag-closing machines and, hence, the income derived by CFSA from the sales of these machines is not foreign base company sales income. At the very least petitioner contends the operations constituted major assembly.

In order to determine the merit of DFC's contention on this point, we must first examine respondent's regulations interpreting the definition of foreign base company sales income found in section 954(d)(1) of the Code.

Section 1.954-3(a)(2) of the regulations provides:

(2) *Property manufactured, produced, constructed, grown, or extracted within the country in which the controlled foreign corporation is created or organized. Foreign base company sales income does not include income derived in connection with the purchase and sale of personal property* (or purchase or sale of personal property on behalf of a related person) in a transaction described in subparagraph (1) of this paragraph *if the property is manufactured, produced, constructed, grown, or extracted in the country under the laws of which the controlled foreign corporation which purchases and sells the property* (or acts on behalf of a related person) *is created or organized.* See section 954(d)(1)(A). The principles set forth in subparagraph (4) of this paragraph with respect to the manufacture, production, or construction of personal property shall apply under this sub-

---

[9] Sec. 1.954-3(a)(3), Income. Tax Regs., provides that "foreign base company sales income" does not include sales income in a situation where the "controlled foreign corporation" sells the property for use, consumption, or disposition *within* the country in which the controlled foreign corporation is organized or created.

[10] Sec. 1.954-3(a)(2), Income Tax Regs. Cf. the report of the Committee on Ways and Means of the House of Representatives, H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 592-593, which in discussing the definition of "foreign base company sales income," states:

"Since the definition covers only transactions involving both a purchase and a sale, it does not apply to income of a controlled foreign corporation from the sale of a product which it manufactures. In a case in which a controlled foreign corporation purchases parts or materials which it then transforms or incorporates into a final product, income from the sale of the final product would not be foreign base company sales income if the corporation substantially transforms the parts or materials, so that, in effect, the final product is not the property purchased. Manufacturing and construction activities (and production, processing, or assembling activities which are substantial in nature) would generally involve substantial transformation of purchased parts or materials."

paragraph in determining what constitutes manufacture, production, or construction of property.[11] * * * [Emphasis supplied.]

Section 1.954–3 (a) (4) (i) of the regulations provides:

(4) *Property manufactured or produced by the controlled foreign corporation.*—(i) *In general.* Foreign base company sales income *does not include income of a controlled foreign corporation derived in connection with the sale of personal property manufactured, produced, or constructed by such corporation in whole or in part from personal property which it has purchased.* A foreign corporation will be considered, for purposes of this subparagraph, to have manufactured, produced, or constructed personal property which it sells if the property sold is in effect not the property which it purchased. In the case of the manufacture, production, or construction of personal property, the property sold will be considered, for purposes of this subparagraph, as not being the property which is purchased if the provisions of subdivision (ii) or (iii) of this subparagraph are satisfied. For rules of apportionment in determining foreign base company sales income derived from the sale of personal property purchased and used as a component part of property which is not manufactured, produced, or constructed, see subparagraph (5) of this paragraph. [Emphasis supplied.]

Section 1.954–3 (a) (4) (ii) of the regulations and the examples thereunder provide:

(ii) *Substantial transformation of property.* If purchased personal property is substantially transformed prior to sale, the property sold will be treated as having been manufactured, produced, or constructed by the selling corporation. The application of this subdivision may be illustrated by the following examples:

*Example (1).* Controlled foreign corporation A, incorporated under the laws of foreign country X, operates a paper factory in foreign country Y. Corporation A purchases from a related person wood pulp grown in country Y. Corporation A, by a series of processes, converts the wood pulp to paper which it sells for use in foreign country Z. *The transformation of wood pulp to paper constitutes the manufacture or production of property for purposes of this subparagraph.*

*Example (2).* Controlled foreign corporation B, incorporated under the laws of foreign country X, purchases steel rods from a related person which produces the steel in foreign country Y. Corporation B operates a machining plant in country X in which it utilizes the purchased steel rods to make screws and bolts. *The transformation of steel rods to screws and bolts constitutes the manufacture or production of property for purposes of this subparagraph.*

---

11 Examples under this section of the regulations are as follows:

*Example (1).* Controlled foreign corporation A, incorporated under the laws of foreign country X, is a wholly owned subsidiary of domestic corporation M. Corporation A purchases coffee beans grown in country X from foreign corporation P, a related person, and sells the beans to M Corporation, a related person, for use in the United States. Income from the purchase and sale of the coffee beans by A Corporation is not foreign base company sales income since the beans were grown in country X.

*Example (2).* Controlled foreign corporation B, incorporated under the laws of foreign country X, is a wholly owned subsidiary of controlled foreign corporation C, also incorporated under the laws of country X. Corporation B purchases and imports into country X rough diamonds mined in foreign country Y; in country X it cuts, polishes, and shapes the diamonds in a process which constitutes manufacturing within the meaning of subparagraph (4) of this paragraph. Corporation B sells the finished diamonds to C Corporation, a related person, which in turn sells them for use in foreign country Z. Since for purposes of this subparagraph the finished diamonds are manufactured in country X, gross income derived by C Corporation from their sale is not foreign base company sales income.

*Example (3).* Controlled foreign corporation C, incorporated under the laws of foreign country X, purchases tuna fish from unrelated persons who own fishing boats which catch such fish on the high seas. Corporation C receives such fish in country X in the condition in which taken from the fishing boats and in such country processes, cans, and sells the fish to related person D, incorporated under the laws of foreign country Y, for consumption in foreign country Z. *The transformation of such fish into canned fish constitutes the manufacture or production of property for purposes of this subparagraph.*

[Emphasis supplied.]

Section 1.954–3(a)(4)(iii) of the regulations and the examples thereunder provide:

(iii) *Manufacture of a product when purchased components constitute part of the property sold.* If purchased property is used as a component part of personal property which is sold, the sale of the property will be treated as the sale of a manufactured product, rather than the sale of component parts, *if the operations conducted by the selling corporation in connection with the property purchased and sold are substantial in nature and are generally considered to constitute the manufacture,* production, or construction of property. *Without limiting this substantive test, which is dependent on the facts and circumstances of each case, the operations* of the selling corporation in connection with the use of the purchased property as a component part of the personal property which is sold *will be considered to constitute the manufacture of a product if in connection with such property conversion costs (direct labor and factory burden) of such corporation account for 20 percent or more of the total cost of goods sold. In no event, however, will packaging, repackaging, labeling, or minor assembly operations constitute the manufacture, production, or construction of property for purposes of section 954(d)(1).* The application of this subdivision may be illustrated by the following examples:

*Example (1).* Controlled foreign corporation A, incorporated under the laws of foreign country X, sells industrial engines for use, consumption, and disposition outside country X. Corporation A, in connection with the assembly of such engines, performs machining and assembly operations. In addition, A corporation purchases, from related and unrelated persons, components manufactured in foreign country Y. On a per unit basis, A Corporation's selling price and costs of such engines are as follows:

| | | |
|---|---:|---:|
| Selling price | | $400 |
| Cost of goods sold: | | |
|   Material— | | |
|     Acquired from related persons | $100 | |
|     Acquired from others | 40 | |
|     Total material | $140 | |
|   Conversion costs (direct labor and factory burden) | 70 | |
|     Total cost of goods sold | | 210 |
| Gross profit | | 190 |
| Administrative and selling expenses | | 50 |
| Taxable income | | 140 |

358

The conversion costs incurred by A Corporation are more than 20 percent of total costs of goods sold ($70/$210 or 33 percent). Although the product sold, an engine, is not sufficiently distinguishable from the components to constitute a substantial transformation of the purchased parts within the meaning of subdivision (ii) of this subparagraph, A Corporation will be considered under this subdivision to have manufactured the product it sells.

*Example (2).* Controlled foreign corporation B, incorporated under the laws of foreign country X, operates an *automobile assembly plant.* In connection with such activity, *B Corporation purchases from related persons assembled engines, transmissions, and certain other components, all of which are manufactured outside of country X; purchases additional components from unrelated persons; conducts stamping, machining, and subassembly operations; and has a substantial investment in tools, jigs, welding equipment, and other machinery and equipment used in the assembly of an automobile.* On a per unit basis, B Corporation's selling price and costs of such automobiles are as follows:

Selling price _____ $2,500
Cost of goods sold:
  Material—
    Acquired from related persons_____ $1,200
    Acquired from others_____ 275

    Total material_____ $1,475
  Conversion costs (direct labor and factory burden) _____ 325

    Total cost of goods sold_____ 1,800

Gross profit_____ 700
Administrative and selling expenses_____ 300

    Taxable income_____ 400

*The product sold, an automobile, is not sufficiently distinguishable from the components purchased (the engine, transmission, etc.) to constitute a substantial transformation of purchased parts within the meaning of subdivision (ii) of this subparagraph. Although conversion costs of B Corporation are less than 20 percent of total cost of goods sold ($325/$1800 or 18 percent), the operations conducted by B Corporation in connection with the property purchased and sold are substantial in nature and are generally considered to constitute the manufacture of a product.* Corporation B will be considered under this subdivision to have manufactured the product it sells.

*Example (3).* Controlled foreign corporation C, incorporated under the laws of foreign country X, purchases from related persons radio parts manufactured in foreign country Y. *Corporation C designs radio kits, packages component parts required for assembly of such kits, and sells the parts in a knocked-down condition to unrelated persons for use outside country X. These packaging operations of C Corporation do not constitute the manufacture, production, or construction of personal property* for purposes of section 954(d)(1).

[Emphasis supplied.]

This regulation espouses both a substantive and objective test for satisfaction. The objective test offers a safe harbor of compliance if

the foreign corporation's operations account for 20 percent or more of the total cost of goods sold. Failure to obtain this safe harbor, however, does not prevent compliance through satisfaction of the substantive test.[12]

Although the term "minor assembling" is found in the regulations [13] and the Senate and House committee reports on the 1962 Revenue Act,[14] its counterpart, "major assembling" is only referred to specifically in the Senate report. The relevant language is found in S. Rept. No. 1881, 87th Cong., 2d Sess., p. 84 (1962), 1962-3 C.B. 790:

> The "foreign base company sales income" referred to here means income from the purchase and sale of property, without any appreciable value being added to the product by the selling corporation. This does not, for example, include cases where any significant amount of manufacturing, *major assembling*, or construction activity is carried on with respect to the product by the selling corporation. On the other hand, activity such as minor assembling, packaging, repackaging or labeling will not be sufficient to exclude the profits from this definition. [Emphasis supplied.]

We are of the opinion, based on the facts presented here, that under the scheme of the Code, the regulations, and the pertinent legislative history of subpart F, the income generated by CFSA from its sales of bag-closing machines is *not* "foreign base company sales income" includable in the income of its "United States shareholder," DFC.

It seems clear that the operations of CFSA are not akin to the examples of "substantial transformation" given in section 1.954-3 (a) (4) (ii), Income Tax Regs., i.e., transforming woodpulp into paper; steel rods into screws or bolts; and tuna fish into canned fish.[15]

However, the operations of CFSA in connection with the components it purchases *do* amount to the manufacture of a product (sec. 1.954-3(a) (4) (iii) of the regulations) since they are substantial and, at the least, must be considered either the "major assembly" or manufacture, in part, of portable bag-closing machines.

---

[12] Respondent, on brief, suggested that CFSA failed to meet this objective test. Using CFSA's financial records, respondent claimed that during the years 1963-66, inclusive, CFSA's operations only accounted for 13.78 percent, 13.98 percent, 13.28 percent, and 13.19 percent, respectively. In its reply brief, petitioner DFC claimed that the figures should read 17.91 percent, 17.52 percent, 17.51 percent, and 17.57 percent, respectively, for the 4 years.

[13] Sec. 1.954-3(a) (4) (iii).

[14] Cf. the report of the Committee on Ways and Means of the House of Representatives, H. Rept. No. 1447, *supra*, 1962-3 C.B. 466, which states:

"The 'foreign base company sales income' referred to here means income from the purchase and sale of property without any appreciable value being added to the product by the selling corporation. This does not, for example, include cases where any significant amount of manufacturing, installation, or construction activity is carried on with respect to the product by the selling corporation. On the other hand, activity such as minor assembling, packaging, repackaging, or labeling would not be sufficient to exclude the profits from this definition."

Also, cf. S. Rept. No. 1881, 87th Cong., 2d Sess., p. 84 (1962), 1962-3 C.B. 790.

[15] Cf. examples under sec. 1.954-3(a) (4) (ii), Income Tax Regs.

We agree, as per examples (1) (industrial engines) and (2) (automobiles) found in section 1.954–3 (a) (4) (iii), Income Tax Regs., the product sold herein, a portable bag-closing machine, is not sufficiently distinguishable from some of its components to constitute a substantial transformation of the purchased parts since the housing and handle remain recognizable as such in the finished machine.

Although the automobile operation in example (2) resulted in a final product not sufficiently distinguishable from some of its components, the substantive test of this regulation was still satisfied because the operations of the foreign corporation were substantial in nature and generally considered to constitute manufacture of a product.

We consider CFSA's operations are similarly substantial and, therefore, CFSA also satisfies the substantive test of the regulation. CFSA (a) tailors and finishes some of its purchased components in order to place these parts in usable condition; (b) puts these tailored components and others together in a 6-hour, 58-step process to form salable, quality bag-closing machines; and (c) possesses in its plant all of the tools and equipment necessary for these activities. As a result of CFSA's operations, the purchaser of one of these devices is guaranteed a carefully put together, well tested, and operable machine.

These operations are not similar to "packaging, repackaging, labeling, or minor assembly" which cannot, in any event, be considered the equivalent of manufacture, production, or construction for purposes of section 954(d) (1). Sec. 1.954–3 (a) (4) (iii)', Income Tax Regs. CFSA's operations are certainly more significant than the packaging of "knocked-down" radio kits given as example (3) in section 1.954–3 (a) (4) (iii). There is nothing minor, insignificant, or insubstantial about the utilization of proper equipment, by trained personnel, in a time-consuming process which has, as its final result, a high-caliber, portable bag-closing machine.

We, therefore, disagree with respondent's contention that the components purchased by CFSA were so perfect that they only had to be simply put together in short periods of time, by not too highly skilled mechanics, whose tasks in this operation were nothing more than ministerial functions. Contrariwise, the record is abundant that the purchased parts were not perfect, that many of them had to be individually tailored and tested in order to have a completed, functioning sewing machine, that the mechanics were trained and experienced and used skill and judgment in performing their tasks, and that they were not performing purely ministerial functions. It was the caliber of CFSA's mechanics which resulted in a smooth-running operation rather than a lack of complexity of the operations.

The operations of CFSA herein are found to be significant major assembly of portable bag-closing machines, substantial in nature, and to constitute the manufacture of a product. Consequently, the income in question is not "foreign base company sales income," includable in the income of CFSA's "United States shareholder," DFC.

> *Decision will be entered for the petitioner in docket No. 1453-70.*
>
> *Decision will be entered under Rule 50 in docket No. 1455-70.*