WEBB EXPORT CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5406-85.          Filed July 26, 1988.

*Aydin S. Caginalp* and *Gregory F. Hauser,* for the petitioner.

*Cynthia J. Mattson* and *Charles A. Ray,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows:

| Year | Deficiency |
|---|---|
| 1977 | $337,324 |
| 1978 | 606,693 |
| 1979 | 588,884 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision whether the timber harvesting activities of Webb Export Corp. during the years 1977, 1978, and 1979 were such as to cause it to fail to qualify as a Domestic International Sales Corporation (DISC) for the years 1977, 1978, and 1979.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Webb Export Corp. (Webb Export or petitioner) was incorporated under the laws of the State of Delaware on February 8, 1974. Since its inception, all its stock (one class, par value $2,500) has been owned by David R. Webb Co., Inc. (David Webb). At the time of the filing of the petition in this case, petitioner's principal office was located in Edinburgh, Indiana, at David Webb's principal office.

For the years ending December 31, 1977, December 31, 1978, and December 31, 1979, petitioner, an accrual basis taxpayer, filed Domestic International Sales Corporation returns Forms 1120-DISC.

Petitioner reported its taxable income, and deemed distribution to David Webb, as follows:

|  | 1977 | 1978 | 1979 |
|---|---|---|---|
| Taxable income | $733,737 | $1,247,156 | $1,280,183 |
| Deemed distribution | 429,222 | 694,863 | 718,439 |

David Webb filed corporate income tax returns, Forms 1120, for the years ending December 31, 1977, 1978, and 1979, and included in income the deemed distributions from petitioner.

Petitioner, being incorporated under the laws of Delaware, met the requirement of section 1.992-1(a)(1), Income Tax Regs.

Petitioner met the capitalization requirements of section 992(a)(1)(C)[1] and sections 1.992-1(a)(4) and 1.992-1(d), Income

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Tax Regs.; had in effect an election pursuant to section 992(b) to be treated as a DISC in accordance with sections 1.992-1(a)(5) and 1.992-1(e), Income Tax Regs.; maintained its bank account on each day of the taxable year in accordance with sections 1.992-1(a)(6) and 1.992-1(i), Income Tax Regs.; and maintained separate books and records in accordance with section 1.992-1(a)(7), Income Tax Regs.

In accordance with section 1.992-1(a)(8), Income Tax Regs., petitioner did not constitute a type of corporation described in section 1.992-1(f), Income Tax Regs. In accordance with section 993(c)(1)(A), petitioner did not extract or grow in the U.S. property that it sold as a DISC. Petitioner did purchase 40 acres of real estate on October 11, 1976, at a price of $45,000, some of the standing timber from which was sold at a price of $17,025.18 in 1976; the real property was sold in 1979 at a price of $38,939.82.

In accordance with section 993(c)(1)(B), petitioner was engaged primarily in the sale, in the ordinary course of trade or business, of property for direct use, consumption, or disposition outside the United States. In accordance with section 993(c)(1)(C), not more than 50 percent of the fair market value of the property exported by petitioner was attributable to articles imported into the United States. The property sold by petitioner was not sold to another DISC.

Petitioner was engaged in sales to foreign customers of two principal items. One was veneer manufactured by David Webb and the other veneer-quality cut logs. The cut logs were either purchased as cut logs from third parties, or petitioner purchased standing timber that it cut, delimbed, bucked, and skidded itself for export as cut logs. On occasion, the grantor from whom petitioner acquired the standing timber was responsible for performing these activities.

Petitioner began purchasing standing timber for export as cut logs in late 1976. Petitioner commenced this activity because the quality and quantity demands placed on petitioner by its European customers required it to obtain a large number of cut logs of uniform consistency. The consistency of logs was necessary in order to match large numbers of pieces on the basis of wood grain. Also, the cost to petitioner of logs it cut from standing timber, including

the timber costs and related costs, was less than the purchase price of cut logs. By using its experienced buyers, petitioner successfully bore the risk of purchasing standing timber, the potential defects of which were not as easily detectable as were defects in cut and trimmed logs.

During the years 1977, 1978, and 1979, the standing timber purchased by petitioner principally consisted of veneer-quality walnut, red oak, and white oak. The average age of each species was in the following range:

| Species | Age |
|---|---|
| Walnut | 60-120 Years |
| White Oak | 80-200 Years |
| Red Oak | 50- 90 Years |

Petitioner did not plant or cultivate hardwoods.

In 1977, 1978, and 1979, petitioner employed several buyers of standing timber and cut logs. In early 1978, Kenneth Hunter (Mr. Hunter) became one of the principal standing-timber buyers for petitioner.

Petitioner had a logging crew that engaged in harvesting activities during the period from September through May of the years involved. The crew consisted of two to four men in the woods, and two men in petitioner's log yard, all of whose jobs were interchangeable. The logging crew was responsible for felling (cutting of timber); delimbing (removal of branches); bucking (cutting into logs of certain required lengths); skidding (moving the logs from the felling point to a roadway); loading (loading the logs onto trucks); and hauling (transporting the logs to petitioner's log yard).

In addition to chain saws used for felling, delimbing, and bucking, the cutting equipment used by petitioner's crews consisted of skidders and a crawler/loader. The skidders were moved between sites by either their being hauled with a low boy, or being driven if the distance was short.

Once in the log yard, the cut logs (whether acquired as cut logs or derived from standing timber) were moved, cataloged, and then shipped.

For a majority of the standing-timber parcels, petitioner used its own logging crew. If two men were at the site, the two men did the felling, delimbing, bucking, loading, and hauling. The time period for these activities could be expedited with four men at the site: one to operate a chain

saw for felling and delimbing; one to buck with a chain saw; one to operate the skidding equipment; and one to operate the loader.

The season for cutting veneer-quality logs for export was from late September to the first of May. In order to preserve the logs, the timber had to be cut after the foliage was off and the sap down, but before the sap began to run in the spring. The higher sap content caused deterioration of the logs. The logs had to arrive in Europe by June 1 to prevent their deterioration.

It was harder to cut, delimb, buck, and skid standing timber during the winter months because of wet ground and inclement weather. The logging crew worked 5 days a week, weather permitting. Approximately one-quarter of the season was lost to bad weather, but sometimes the crew worked weekends to make deadlines. To cut, delimb, buck, skid, haul, and load 100 large trees would take a crew of four men in the woods between 2 and 5 days, depending on the conditions. Often, care had to be taken not to damage the surrounding property.

Petitioner was interested in the veneer-quality, "butt" log, the first 12 to 16 feet of tree above the stump, of the standing timber which resulted from the bucking process. Firewood was usually left behind by the crew, but other portions of the tree were sometimes sold to third parties in de minimis amounts. Since the crew was working with valuable hardwood, improper felling and bucking could be costly.

Decisions as to the movement of the crew from one site to the next were ultimately subject to approval by John Grunwald (Mr. Grunwald).

When petitioner purchased cut logs from third parties, it purchased the logs either: (1) f.o.b. Edinburgh, Indiana, in which case the transportation cost was borne by the seller; or (2) f.o.b. truck, in which case petitioner transported the logs within the vicinity of Edinburgh, or contracted with a third party for longer distance hauling.

The average costs to petitioner for the various jobs associated with cutting its standing timber into logs constituted a small portion of the purchase price of the standing timber because the standing timber purchased was

valuable, veneer-quality hardwood. The following were representative costs:

Felling .............................. $10/1,000 Board ft. (1″x12″x12″)
Skidding ............................ 20/1,000 ″
Bucking............................. 5/1,000 ″
Loading............................. 5-10/1,000 ″
Hauling ............................ 20-40/1,000 ″

Due to its high quality, the purchase price of the standing timber that petitioner sold as cut logs was in the range of $500 to $2,000 per 1,000 board ft.

As previously noted, in late 1976, petitioner purchased land containing standing timber in order to remove the standing timber thereon because the owner would not sell the standing timber without selling the land. The timber was cut and sold in late 1976. Petitioner cleaned up the property for resale, required as a result of the timber removal, and sold the land in 1979.

Petitioner's purchases of cut logs and standing timber for 1977, 1978, and 1979 were as follows:

|  | 1977 | 1978 | 1979 |
| --- | --- | --- | --- |
| Cut logs | $2,564,075 | $4,421,315 | $6,468,066 |
| Standing timber | 442,083 | 925,239 | 563,368 |
| Total | 3,006,158 | 5,346,554 | 7,031,434 |

Petitioner's inventories as of the end of 1977, 1978, and 1979, comprised of cut logs, standing timber, and a farm purchased for standing timber, were as follows:

|  | 1977 | 1978 | 1979 |
| --- | --- | --- | --- |
| Cut logs | $22,128 | $54,470 | $266,722 |
| Standing timber | 294,245 | 379,061 | 621,387 |
| Farm | 38,940 | 38,940 | - - - |
| Total | 355,313 | 472,471 | 888,109 |

Petitioner's total gross receipts for 1977, 1978, and 1979, and gross receipts pertaining to standing timber, were as follows:

| Gross receipts | 1977 | 1978 | 1979 |
| --- | --- | --- | --- |
| Pertaining to standing timber | $205,749 | $1,257,949 | $305,988 |
| Total | 12,745,645 | 20,553,417 | 22,241,535 |
| Percent pertaining to standing timber | 1.61% | 6.12% | 1.38% |

The total adjusted bases of petitioner's assets as of the end of 1977, 1978, and 1979 were as follows:

|  | 1977 | 1978 | 1979 |
|---|---|---|---|
| Inventory |  |  |  |
| Standing timber* | $294,245 | $379,061 | $621,387 |
| Farm* | 38,940 | 38,940 | - - - |
| Logs | 22,128 | 54,470 | 266,722 |
| Depreciable assets |  |  |  |
| Cutting equipment* | 86,270 | 94,874 | 94,874 |
| Other | 159,675 | 156,615 | 156,615 |
| Accumulated depreciation |  |  |  |
| Cutting equipment* | (2,621) | (20,319) | (21,347) |
| Other | (7,897) | (44,802) | (102,858) |
| Prepaid interest | 19,150 | 15,134 | 10,089 |
| Producer's loans | 565,793 | 1,118,086 | 1,679,830 |
| Trade receivables |  |  |  |
| Standing timber* | 6,256 | 177,746 | 51,593 |
| Veneer and logs | 382,698 | 2,726,603 | 3,687,006 |
| Working capital | - - - | 60,444 | (114,422) |
| Receivables/deposit | - - - | 36,984 | 23,614 |
| Total | 1,564,637 | 4,793,836 | 6,353,103 |

*The assets pertaining to standing timber are designated with an asterisk (*) and were 27.04 percent, 13.98 percent, and 11.75 percent of the total gross assets for the years 1977, 1978, and 1979, respectively. The "Producer's loans" constitute qualified export assets.

In the statutory notice of deficiency respondent determined that petitioner did not qualify as a DISC for the years in issue, 1977, 1978, and 1979, because—

[Petitioner's] qualified receipts for the years ended December 31, 1977[2] and December 31, 1978 were less than 95% of [petitioner's] gross receipts for those years and because the adjusted basis of [petitioner's] qualified export assets were less than 95% of the sum of the adjusted basis of all [petitioner's] assets at December 31, 1977, December 31, 1978 and December 31, 1979. [Petitioner is] therefore a taxable entity during [its] taxable years ended December 31, 1977, December 31, 1978 and December 31, 1979.[3]

---

[2]As noted previously, the parties subsequently stipulated that the percentage of gross receipts from standing timber (i.e., nonqualified receipts) for the years ending Dec. 31, 1977, was only 1.61 percent.

[3]Petitioner's costs with respect to the cutting, delimbing, bucking, and skidding of its standing timber did not exceed 20 percent of the cost of the standing timber and respondent concedes that the 20-percent test of sec. 1.993-3(c)(2)(iv), Income Tax Regs., has been satisfied by petitioner for each of the 3 years in issue.

The parties stipulated that petitioner is entitled to make a deficiency distribution as allowed by sec. 1.992-3, Income Tax Regs., in an amount computed on the basis of the facts in the returns in the event that it is determined that the standing timber and related assets did not constitute qualified export assets or the receipts therefrom did not constitute qualified export receipts.

OPINION

In order to qualify as a DISC, for any taxable year, a corporation must, inter alia, derive 95 percent or more of its gross receipts from qualified export receipts and the adjusted bases of the corporation's qualified export assets at the close of the taxable year must equal or exceed 95 percent of the total adjusted bases of all assets of the corporation at that time. Secs. 992(a)(1)(A) and 992(a)(1)(B). Insofar as pertinent to this case, qualified export receipts are defined as "gross receipts from the sale, exchange, or other disposition of export property." Sec. 993(a)(1)(A). Qualified export assets include export property and assets used primarily in connection with the sale, lease, rental, storage, handling, transportation, etc., of export property. Sec. 993(b)(1) and (b)(2).

Subject to certain exclusions, "export property" is defined generally by section 993(c) as property—

(A) manufactured, produced, grown, or extracted in the United States by a person other than a DISC,

(B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States, and

(C) not more than 50 percent of the fair market value of which is attributable to articles imported into the United States.

Respondent contends petitioner's harvesting of standing timber constitutes the "production" of property so that the resulting veneer logs do not constitute "export property" and the assets used in connection with harvesting the logs do not constitute qualified export assets. If respondent is correct, petitioner cannot satisfy either the qualified export receipts test for taxable year 1978 or the qualified export assets test for taxable years 1977 or 1978 and cannot satisfy the qualified export assets test for 1979 if we conclude that petitioner is incorrect in its contention that in any event the standing timber is a qualified export asset. Resolution of the issue as to whether petitioner's timber harvesting constitutes "production" turns upon our interpretation of section 1.993-3(c)(2), Income Tax Regs.,[4] dealing

---

[4]Sec. 1.993-3(c)(2), Income Tax Regs., reads in part as follows:

(c) *Manufacture, production, growth, or extraction of property—* * * *

with the manufacture or production of property.

Respondent does not argue that petitioner's activities constituted the manufacture of property. Consequently, our inquiry is confined to the question of whether those harvesting activities constituted "production" within the meaning of this regulation.

To be considered "production" under the regulation, the property in question must have been "substantially transformed" by petitioner (sec. 1.993-3(c)(2)(ii), Income Tax Regs.), or the harvesting activities performed by petitioner in connection with the standing timber must have been "substantial in nature" and "generally considered to constitute the * * * production of property." Sec. 1.993-3(a)(2)(iii), Income Tax Regs.

Petitioner contends that its logging activities do not constitute the substantial transformation of property and that those activities are neither substantial in nature nor generally considered the manufacture or production of property. Petitioner further argues that the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, established standing timber as export property and therefore a qualified export asset. On this theory, petitioner contends that the adjusted bases of 95 percent or more of its assets do consist of qualified export assets so that it satisfies the qualified export asset test for each of the years in issue.[5]

---

(2) *Manufactured or produced.*—(i) *In general.* For purposes of this section, property which is sold or leased by a person is considered to be manufactured or produced by such person if such property is manufactured or produced (within the meaning of either subdivision (ii), (iii), or (iv) of this subparagraph) by such person or by another person pursuant to a contract with such person. Except as provided in subdivision (iv) of this subparagraph, manufacture or production of property does not include assembly or packaging operations with respect to property.

(ii) *Substantial transformation.* Property is manufactured or produced by a person if such property is substantially transformed by such person. Examples of substantial transformation of property would include the conversion of woodpulp to paper, steel rods to screws and bolts, and the canning of fish.

(iii) *Operations generally considered to constitute manufacturing.* Property is manufactured or produced by a person if the operations performed by such person in connection with such property are substantial in nature and are generally considered to constitute the manufacture or production of property.

[5]It is respondent's position that only in the year 1979 would considering petitioner's standing timber to be an export asset, but the assets connected with the harvesting of the timber not to be export assets, result in less than 5 percent of petitioner's assets not being qualified export assets.

## Substantial in Nature and Generally Considered
## To Constitute Production

Petitioner argues that its logging activities were neither substantial in nature nor generally considered the manufacture or production of property within the meaning of section 1.993-3(c)(2)(iii), Income Tax Regs.

### A. *Substantial in Nature*

It is petitioner's position that the activities were not substantial because the unrefuted expert testimony established that the hardwood products industry does not generally consider logging to be production and that petitioner's activities were a limited, rudimentary, small-scale operation. Petitioner cites *Dave Fischbein Manufacturing Co. v. Commissioner*, 59 T.C. 338 (1972) (*Dave Fischbein*), to support its position contending that here its activities unlike those in *Dave Fischbein v. Commissioner, supra,* were not substantial.

Respondent contends the activities of petitioner were substantial in nature and that petitioner's quantitative argument is in direct conflict with the testimony and the facts, which show that petitioner's activities cannot be characterized as insignificant or insubstantial. Respondent argues that petitioner ignores the Court's interpretation of "substantial in nature" in *Dave Fischbein v. Commissioner, supra.*

Section 1.954-3(a)(4), Income Tax Regs., dealing with manufacture or production by a controlled foreign corporation, which was discussed in *Dave Fischbein v. Commissioner, supra,* unlike regulations section 1.993-3(c)(2)(ii), gives examples of "substantial in nature." Petitioner contends the facts herein are so distinguishable from those in *Dave Fischbein v. Commissioner, supra,* that the Court should conclude it did not "produce" the logs from the standing timber.

*Dave Fischbein v. Commissioner, supra,* on which both parties rely, involved a different issue from the issue involved in the instant case. One of the issues in that case was whether Dave Fischbein Manufacturing Co. (DFM) was required to include in its income certain income earned by its foreign subsidiary, Compagnie Fischbein, S.A. (CFSA), on

the basis that it constituted "subpart F" income as defined in section 954(d)(1) as "foreign base company sales income." CFSA purchased component parts for its "product," a bag-closing machine (most of the major components), from DFM and from unrelated third parties in Europe (standard parts). Among CFSA's reasons for purchasing parts in this way were: (1) To obtain Belgian certificates of origin, for European Common Market considerations, which required that the machines be of Belgian origin; and (2) to lower labor and overhead costs by completing the assembly of the machines in Europe rather than in the United States. That assembly required 58 steps taking some 6 hours. Within the completed machine, certain components such as the housing and handle remained recognizable.

Under the statutory scheme, foreign base company sales income did not include income with respect to personal property, produced in the country under the laws of which the controlled corporation is created or organized, which is sold for use outside the country. See also sec. 1.954-3(a)(2), Income Tax Regs. DFM contended, and the Commissioner disagreed, that the machines were produced in Belgium so that the resultant income was not includable in its income.

Under section 1.954-3(a)(4)(i), Income Tax Regs., a foreign corporation was considered to have manufactured, produced, or constructed personal property if what it sold was in effect not what it purchased. In that context, property would be considered to have been manufactured, produced, or constructed if section 1.954-3(a)(4)(ii) or section 1.954-3(a)(4)(iii),[6] Income Tax Regs., was satisfied.

---

[6]Sec. 1.954-3(a)(4)(iii), Income Tax Regs., provided in pertinent part as follows:

(iii) *Manufacture of a product when purchased components constitute part of the property sold.* If purchased property is used as a component part of personal property which is sold, the sale of the property will be treated as the sale of a manufactured product, rather than the sale of component parts, if the operations conducted by the selling corporation in connection with the property purchased and sold are substantial in nature and are generally considered to constitute the manufacture, production, or construction of property. Without limiting this substantive test, which is dependent on the facts and circumstances of each case, the operations of the selling corporation in connection with the use of the purchased property as a component part of the personal property which is sold will be considered to constitute the manufacture of a product if in connection with such property conversion costs (direct labor and factory burden) of such corporation account for 20 percent or more of the total cost of goods sold. In no event, however, will packaging, repackaging, labeling, or minor assembly operations constitute the manufacture, production, or construction of property for purposes of section 954(d)(1). The application of this subdivision may be illustrated by the following examples:

Section 1.954-3(a)(4)(ii), Income Tax Regs., treats property as having been manufactured, produced, or constructed if it was substantially transformed prior to sale and contains in somewhat expanded form the substantial transformation examples found in section 1.993-3(c)(2)(ii), Income Tax Regs.

In *Dave Fischbein v. Commissioner, supra,* we found that the income with respect to the sale of the machines by CFSA was not, under the facts therein, foreign base company sales income includable by DFM. In reaching this conclusion we rejected respondent's contention that petitioner's operations required merely the assembly of nearly perfect components, over a short time period, by unskilled personnel. We found the facts to be otherwise, specifically that the parts often required tailoring and testing to complete assembly and that the personnel were trained and experienced, employing both skill and judgment in the performance of their duties.

\*    \*    \*    \*    \*    \*    \*

*Example (2).* Controlled foreign corporation B, incorporated under the laws of foreign country X, operates an automobile assembly plant. In connection with such activity, B Corporation purchases from related persons assembled engines, transmissions, and certain other components, all of which are manufactured outside of country X; purchases additional components from unrelated persons; conducts stamping, machining, and subassembly operations; and has a substantial investment in tools, jigs, welding equipment, and other machinery and equipment used in the assembly of an automobile. On a per unit basis, B Corporation's selling price and costs of such automobiles are as follows:

| | | |
|---|---:|---:|
| Selling price | | $2,500 |
| Cost of goods sold: | | |
| Material— | | |
| Acquired from related persons | $1,200 | |
| Acquired from others | 275 | |
| Total material | | 1,475 |
| Conversion costs (direct labor and factory burden) | | 325 |
| Total cost of goods sold | | 1,800 |
| Gross profit | | 700 |
| Administrative and selling expenses | | 300 |
| Taxable income | | 400 |

The product sold, an automobile, is not sufficiently distinguishable from the components purchased (the engine, transmission, etc.) to constitute a substantial transformation of purchased parts within the meaning of subdivision (ii) of this subparagraph. Although conversion costs of B Corporation are less than 20 percent of total cost of goods sold ($325/$1800 or 18 percent), the operations conducted by B Corporation in connection with the property purchased and sold are substantial in nature and are generally considered to constitute the manufacture of a product. Corporation B will be considered under this subdivision to have manufactured the product it sells.

*Example (3).* Controlled foreign corporation C, incorporated under the laws of foreign country X, purchases from related persons radio parts manufactured in foreign country Y. Corporation C designs radio kits, packages component parts required for assembly of such kits, and sells the parts in a knocked-down condition to unrelated persons for use outside country X. These packaging operations of C Corporation do not constitute the manufacture, production, or construction of personal property for purposes of section 954(d)(1).

Applying the regulations described above, we concluded there was no "substantial transformation" similar to the examples within section 1.954-3(a)(4)(ii), Income Tax Regs., because the resultant product was not sufficiently distinguishable from its component parts. However, we found the activities of CFSA to be the manufacture of a product within section 1.954-3(a)(4)(iii), Income Tax Regs., because they were both substantial in nature and generally considered to constitute manufacture of a product similar to the automobile assembly operation in example (2) of the regulation. We reached this conclusion based upon several actions taken by CFSA including:

(a) tailor[ing] and finish[ing] some of its purchased components in order to place these parts in usable condition; (b) put[ting] these tailored components and others together in a 6-hour, 58-step process to form salable, quality bag-closing machines; and (c) possess[ing] in its plant all of the tools and equipment necessary for these activities. As a result of CFSA's operations, the purchaser of one of these devices is guaranteed a carefully put together, well tested, and operable machine. [*Dave Fischbein v. Commissioner, supra* at 360.]

Although *Dave Fischbein v. Commissioner, supra,* involved a different statute, the term "substantial in nature" as interpreted therein supports the conclusion that on the facts here present petitioner's activities were "substantial in nature." Here the purchased standing timber was subjected to an extensive subtraction and selection process in which veneer-quality trees were identified by petitioner's purchasing agents and arrangements were made with the property owners for their purchase. The next steps in the process involved petitioner's crew, of standard size in the logging industry, felling, delimbing, bucking, skidding, and hauling the timber. Each of these steps required the exercise of skill and judgment on the part of petitioner's trained, experienced crew. This resulted in the maximum output of the valuable hardwood by incurring the least damage during the logging process. The end result of these steps was the production of individual veneer-quality logs identifiable by number and specifications. During the years in issue, petitioner purchased more than 100 parcels of standing timber repeating this process each time so as to be able to supply several European mills with sufficient quantities of

veneer logs to maintain their operations throughout the year.

These various steps, a time-consuming, yet time-constrained, process in which petitioner possessed all the necessary tools and equipment utilized in its logging operations, when combined, constitute a process substantial in nature. We agree with the statement of this Court in *Dave Fischbein v. Commissioner, supra* at 360, in finding nothing insignificant or insubstantial in petitioner's "utilization of proper equipment, by trained personnel, in a time-consuming process which has, as its result," a high quality, individually identifiable veneer-quality log satisfying the specifications of its purchaser.

However, to be considered "production," the operations of petitioner must not only be substantial in nature but also generally considered to constitute production.

## B. *Generally Considered To Constitute Production*

Petitioner contends the unrefuted testimony establishes that logging is not generally considered the manufacture or production of property. Respondent argues that petitioner misleads the Court with the above contention because the weight of the evidence indicates that the forest products industry generally considers harvesting to be production.

Petitioner's experts included John A. Grunwald (Mr. Grunwald), petitioner's president and the president and chief executive officer of David Webb; Albert DeBonis (Mr. DeBonis), president of Wood Advisory Services, Inc., a wood and wood-based-products consulting organization; and George Kelly (Mr. Kelly), retired president of the Hardwood Manufacturer's Association.

Mr. Grunwald testified that, from the viewpoint of a manufacturer, the severance of standing timber was not equal to production because it was merely a means for making a raw material transportable. Mr. Grunwald acknowledged that loggers refer to logging as production and that a log is a distinct element of a tree, and agreed that a conversion took place between standing timber and a log. He also agreed that standing timber cannot be exported, and that veneer cannot be manufactured from standing timber. However, Mr. Grunwald testified that petitioner

was not engaged in "production" because logs and standing timber were both considered raw materials for the production of decorative veneer and lumber by those in the veneer industry.

Mr. Grunwald further acknowledged that he, as a veneer manufacturer, was unconcerned with the harvesting industry, viewing raw materials merely as something he had to purchase to be able to manufacture a product, and admitted that a furniture manufacturer would consider the veneer produced by David Webb to be its raw material, although David Webb would still consider itself a producer of veneer.

Mr. DeBonis testified that a log is nothing more than the stem of a tree and, thus, is not the result of any manufacturing or production process. He acknowledged, however, that a standing tree was of little use until certain processing functions had been performed and that those functions involved substantial activities.

Mr. DeBonis stated that in the forest products industry as a whole, logging was not considered production because there was no transformation of the material, i.e.—the log is not different from the tree, and because manufacturers consider logs to be the starting point of manufacturing. Mr. DeBonis, however, acknowledged that harvesters refer to logging as production, that standing timber is functionally different from logs, that in its standing form it is not useful to veneer manufacturers, and that the authorities he relied upon to support his position that logs are raw materials also refer to logs as products.

Mr. Kelly was asked to testify with respect to his opinion of whether petitioner's activities constituted manufacturing. He concluded petitioner's activities were not generally considered the manufacture or production of property, but were merely log harvesting. He admitted that loggers refer to logging as production and that hardwood manufacturers prefer logs to standing timber. Mr. Kelly concluded that even though harvesting is a necessary step toward the manufacturing process, the conversion of standing timber into logs was not production because the logger has not produced anything that was not already there.

Respondent's experts were William R. Sizemore (Mr. Sizemore), a forester and appraiser specializing in forest

land management; Kenneth Hunter (Mr. Hunter), a former procurement buyer for petitioner; and Harold E. Burghart (Mr. Burghart), an IRS forester.

Mr. Sizemore testified that he had worked with many integrated companies which referred to harvesting as production and to logs as products. While veneer harvesting required more care than pine or softwood harvesting, the same fundamental steps were required. Mr. Sizemore disagreed with petitioner's experts' inference that severance of standing timber was merely a means of making raw materials transportable because there is no way to use the standing timber without severance. In his opinion, hardwood veneer logs are the result of a subtraction and selection process, and their resultant value far exceeds the value of the stumpage price and harvesting costs. Agreeing that conversion added nothing that was not already there, he concluded the goal of the harvesting process, the production of veneer logs, was achieved by a subtraction process. Mr. Sizemore also cited examples in which logging was considered production by the U.S. Departments of Commerce and Agriculture, the Cooperative Extension Service of the State of Indiana, the Society of American Foresters, and several international agencies. Based upon his experience in the forest products industry and the various authorities he relied upon, Mr. Sizemore concluded that logging is generally considered to constitute production in the forest products industry.

Mr. Hunter testified that he considered the purchase of standing timber and the harvesting of it into logs to be production in the sense of making a commodity from a tree. He acknowledged, however, that there is some degree of self-aggrandizement in loggers considering themselves to be producers.

Mr. Burghart, relying upon his experience as a forester and various authorities such as the U.S. Forest Service, the Canadian Forest Service, the Indiana Directory of Loggers, the Society of American Foresters, and various university publications, testified that, in his opinion, petitioner's activities were generally considered production within the forest products industry. He disagreed with Mr. DeBonis' statement that a log is nothing more than a tree. To the

contrary, he concluded that a log exists only through the activities, such as those undertaken by petitioner, of man. He also disagreed with Mr. Grunwald's statement that standing timber is a raw material, instead considering it to be a natural resource used in the production of logs. He concluded that petitioner's operations require the "use of trained loggers knowledgeable about log specifications, use of chain saws and other specialized equipment, and considerable coordination of men and equipment under all kinds of operating conditions. In the forest products industry, harvesting of standing timber is considered to constitute a production activity in which logs or other timber products are produced."

We disagree with petitioner's contention that the unrefuted testimony establishes that petitioner's activities are not generally considered production. Rather, the experts were divided between those who had a manufacturer's viewpoint, that logging was not production—and those with a broader forest products industry viewpoint—that logging activities are generally considered production.

Petitioner argues that although respondent and his experts rely upon materials which refer to logs as products, log output as production, and logging as productivity, respondent has failed to show that those references necessarily mean that logging is generally considered to constitute the production of property within the meaning of the regulation.

Petitioner further argues that respondent's expert Mr. Burghart relied, inter alia, upon a Forest Service Handbook excerpt in which items such as nuts and fruits are referred to as "products." Petitioner thus contends that respondent's position includes within the definition of "product," "anything that is sold and not necessarily property that is first produced by human hand, otherwise, nuts, fruits, and growing trees could not be products. Respondent's evidence referring to logs as products is therefore of no conclusive value."

Petitioner misconstrues the excerpt which refers in fact not only to "*products* derived from harvested trees, *such as logs,* lumber, pulpwood, * * * but also of products derived from standing trees, such as gum naval stores, * * *

fruits, nuts, bark and Christmas greens." (Emphasis added.) We conclude that the harvesting of timber of the type done by petitioner is "production" resulting in a veneer log "product." The record shows that substantial activity and workmen's skill is necessary to obtain a log from a standing tree and that this activity is of a type which would generally be considered production. We accept and agree with the testimony of respondent's experts that the activities engaged in by petitioner are generally considered as production in the forest products industry. Petitioner argues that the conclusory testimony of respondent's experts, that logging is generally considered production, is not helpful because the testimony of these witnesses is premised on a harvester's viewpoint.

We consider it appropriate under the regulations to determine how harvesting or logging is generally perceived in the forest products industry and not appropriate to limit our consideration to how logging is perceived from a hardwood manufacturer's point of view. We conclude that the weight of the evidence indicates that logging is generally viewed as production. In arriving at this conclusion, we have not only considered the testimony of respondent's experts but also the fact that petitioner's experts acknowledged that: (1) Loggers consider themselves to be producers; (2) standing timber is not particularly useful to manufacturers; (3) substantial activities are required before such materials are useful to manufacturers; and (4) the items considered to be raw materials and who is perceived to be a producer, varies depending upon one's position in the manufacturing and/or production process.

In accordance with our conclusion that petitioner's activities were substantial in nature and that these activities are generally considered production, we hold that the veneer logs sold by petitioner have been produced by petitioner within the meaning of section 1.993-3(c)(2)(iii), Income Tax Regs. Accordingly, it is unnecessary to consider whether petitioner's activities constituted a substantial transformation under section 1.993-3(c)(2)(ii), Income Tax Regs.

Because the veneer logs sold by petitioner were also "produced" by petitioner, they do not qualify as "export property," and thus cannot generate "qualified export

receipts." Sec. 993(a)(1)(A). Also, since these logs are not export property they are not qualified export assets. Secs. 993(b)(1) and 993(c)(1)(A). Also, the assets attributable to the production of these products which are not export property are not qualified export assets. Sec. 993(b)(2).

We have found that the percentage of petitioner's gross receipts from the sale of logs it harvested from standing timber in 1978 was 6.12 percent. We thus hold that for 1978, petitioner does not qualify as a DISC since it fails to satisfy the qualified export receipts test of section 992(a)(1)(A) because its qualified export receipts do not equal or exceed 95 percent of its gross receipts.

Petitioner does satisfy the qualified export receipts test of section 992(a)(1)(A) for the years 1977 and 1979. However, petitioner is disqualified as a DISC for those years if it fails to satisfy the qualified export asset test of section 992(a)(1)(B). As noted, the qualified export asset test requires that the adjusted bases of petitioner's qualified export assets equal or exceed 95 percent of the adjusted bases of all petitioner's assets at the close of the taxable year. Sec. 992(a)(1)(B).

Section 993(b) includes within qualified export assets (1) export property and (2) assets used primarily in connection with the sale, lease, etc. of export property. Sec. 1.993-2(a), Income Tax Regs., also includes within qualified export assets, business assets. However, section 1.993-2(c), Income Tax Regs., states:

Assets used primarily in the manufacture, production, growth, or extraction (within the meaning of sec. 1.993-3(c)) of property are not business assets.

Petitioner contends that its standing timber is export property and therefore a qualified export asset. Petitioner further argues that the assets used in connection with its activities were also qualified export assets because the logging activities were not production. Since we have previously held that petitioner's logging activities constitute production, those assets used in such production do not constitute qualified export assets.

Petitioner contends that regardless of our conclusion as to whether its logging operations constitute production, its

standing timber is an "export asset." Petitioner contends that the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, specifically makes "timber" an export asset. It is petitioner's position that since the Tax Reform Act of 1976 removed timber products from the specific exclusion from "export property" provided for in section 993(c)(2)(C), this act made standing timber "export property." Prior to its amendment by the Tax Reform Act of 1976, section 993(c)(2)(C) excluded from export property "products of a character with respect to which a deduction for depletion is allowable * * * under section 611." Section 611 provided for the allowance of a depletion deduction "in case of mines, oil and gas wells, other natural deposits, and timber." The provision of the Tax Reform Act of 1976 amending section 993(c)(2)(C) deleted the words "under section 611" and substituted therefor "under section 613 or 613A." Since a provision for depletion of timber is not included in section 613 or 613A, products from timber were no longer specifically excluded from the definition of "export property." For this reason the veneer, lumber, and logs purchased by petitioner for export were entitled to be considered "export property." However, the amendment to section 993(c)(2)(C) did not change the provision of section 993(c)(1) that export property means property "manufactured, produced, grown or extracted in the United States by a person other than a DISC * * * held primarily for sale * * * in the ordinary course of trade or business * * * for direct use * * * outside the United States." The record here shows and we have found that petitioner's standing timber was not held for sale by petitioner in the ordinary course of its trade or business for direct use outside the United States. This standing timber was held by petitioner for production into veneer logs to be sold by it. Since the standing timber was not held for sale prior to its production into veneer logs, it was not "export property."

Because petitioner's activities constituted the production of property in the form of veneer logs, we conclude that the logs produced by petitioner are not export property. As previously stated petitioner's standing timber does not constitute export property. Also, this timber was an asset used in connection with the logs produced by petitioner.

Therefore under section 1.993-2(c), Income Tax Regs., we exclude from export property those assets, including the standing timber, used in connection with the production of veneer logs by petitioner. Based upon our previous finding that the percentage of petitioner's assets attributable to standing timber equaled 27.04, 13.98, and 11.75 percent for 1977, 1978, and 1979, respectively, we hold that petitioner did not satisfy the qualified export asset test of section 992(a)(1)(B) for any of the years in issue. Accordingly, we hold that petitioner did not qualify as a DISC for any of the years 1977, 1978, or 1979.

*Decision will be entered under Rule 155.*