T.C. Memo. 1996-129


UNITED STATES TAX COURT


PULSAR COMPONENTS INTERNATIONAL, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15172-92.            Filed March 14, 1996.


        <u>Held</u>:  Compensation paid by P to two of its
officers/shareholders is reasonable.  Both officers had
the appropriate education and employment background for
their positions with P, worked long hours for the
company and its predecessor, and helped increase its
gross sales in a volatile market.  The success of the
business required great expertise in trading computer
chips and microprocessors.  These qualities were
especially exemplified during the taxable year at issue
when P proved profitable even though it faced adverse
economic conditions.  Moreover, P's retained earnings
grew, and P paid regular dividends.  Although P paid
the officers more compensation than provided for in
their employment agreements, all of their compensation
was reasonable in light of the significant appreciation
in the value of P's stock and other facts and
circumstances.


<u>Charles R. Goulding</u> and <u>Michael S. Press</u>, for petitioner.

Halvor N. Adams III and Thomas J Kerrigan, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, Judge:  Pulsar Components International, Inc., petitioned the Court to redetermine respondent's determination of a $382,771 deficiency in its income tax for its taxable year ended July 31, 1985.  Respondent determined that $822,000 of the $2,922,000 claimed by petitioner as officers' compensation was unreasonable.  In an amendment to her answer, respondent asserted that $2,324,170 of the claimed compensation was unreasonable, increasing the claimed deficiency to $1,089,369.  Respondent also asserted in the amendment that petitioner was liable for an addition to tax under section 6661.

We must decide the amount of compensation paid by petitioner that is reasonable and thus deductible as a business expense under section 162.  We hold all of it is.[1]  Unless otherwise stated, section references are to the Internal Revenue Code in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.  We separately refer to Thomas F. Laviano and Peter T. Woll as Mr. Laviano and Mr. Woll, respectively.  We collectively refer to them as the Officers.

FINDINGS OF FACT

---

[1] Accordingly, we also hold that petitioner is not liable for the addition to tax asserted by respondent.

Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner's principal office was in Hicksville, New York, when it petitioned the Court. Petitioner filed its Federal income tax return based on a fiscal year ending July 31, 1985, and it used the cash receipts and disbursements method.

1.  Petitioner

Petitioner is a "third-tier chip broker" that locates, purchases, and sells computer chips, electronic components, and integrated circuits.[2] Petitioner and its predecessor, Pulsar Components, Inc. (Components), developed a niche in their field that enabled them to take advantage of supply and demand imbalances caused by the production capacities of microchip manufacturers and the production needs of computer manufacturers. Petitioner located scarce parts during periods of low supply and high demand by using a network of brokers, surplus houses, distributors, and manufacturers, of which it had a working

_____

[2] Computer manufacturers obtain electronic components and microchips from three sources (tiers) of supply. The first tier, the primary source of supply of electronic components, is a chip manufacturer such as Intel, Micron, or Fujitsu. Approximately 90 percent of the parts purchased by equipment manufacturers are purchased directly from chip manufacturers. The second tier, franchise distributors such as Arrow Electronics, Hamilton-Avnet, and Schweber, are typically large corporations that warehouse substantial inventories of parts. Franchised distributors have franchise agreements to represent product lines of certain manufacturers, and they sell parts out of inventory for a set markup that is usually 15 to 20 percent. The third tier consists of chip brokers and traders like petitioner.

knowledge, and by using the sources of supply that were developed therefrom.

Unlike its competitors, petitioner derived economies by copying the trading operations of some of the large securities firms on Wall Street in New York, New York. Petitioner's traders worked out of a trading pit where purchasing and selling transactions were brokered in a matter of seconds. Petitioner's traders did not have a set markup on parts sold; instead, they worked off market prices; i.e., petitioner profited on the spread between the purchase and selling price when it was able to match a customer's need with the integrated circuits that petitioner could locate. Petitioner carried minimal inventory, had a high inventory turnover rate, and had no written agreements with manufacturers. Petitioner generally did not order goods for which it did not have a buyer, and in the rare cases that it did, it always had the option of selling the goods before they were delivered or canceling the order.

2.  Petitioner's Owners

The Officers were longtime friends who met in grade school. They organized Components in October 1979 by contributing a total of $2,000 in cash in return for all of its stock. Mr. Laviano received 75 percent of the stock, and Mr. Woll received the other 25 percent. The business of Components was headquartered in the basement of the home of Mr. Laviano's parents. The Officers used

card tables and folding chairs as furniture, and they rented telephones.

With the Officers at the helm, Components prospered and became a successful entity.  Although its gross receipts varied greatly from year to year, based on the volatility of the industry, Components reported the following results for the taxable years ended November 30, 1979, through November 30, 1982:

|  | Nov. 30, 1979 | Nov. 30, 1980 | Nov. 30, 1981 | Nov. 30, 1982 |
|---|---|---|---|---|
| Sales | $251,588 | $5,061,159 | $1,876,555 | $2,061,989 |
| Gross profit on sales | $5,349 | $1,499,411 | $779,655 | $832,036 |
| Gross profit on sales as a percentage of sales | 2.1% | 29.6% | 41.5% | 40.4% |
| Taxable income (loss) | ($110) | ($4,592) | $4,136 | $32,967 |
| Retained earnings (deficit) | ($110) | ($14,691) | ($11,562) | $23,806 |

In the fall of 1982, the Officers agreed to transfer Components to petitioner so that Mr. Woll could increase his ownership percentage and John Laviano, Mr. Laviano's younger brother, could become a shareholder.  Petitioner was organized on August 3, 1982.  From petitioner's organization through July 31, 1985, Mr. Laviano owned 55 percent of its stock, Mr. Woll owned 40 percent, and John Laviano owned the remaining 5 percent. Petitioner's board of directors consisted of Mr. Laviano,

Mr. Woll, and John Laviano.  Petitioner commenced business on December 1, 1982.

Petitioner conducted the same business as Components; the only changes were the addition of the word "International" to the name and the change in ownership percentages.  All of Components' accounts and sources of supply that were developed prior to petitioner's organization, and all employees who were trained prior to the organization of petitioner, were transferred to petitioner.

### a.  Mr. Laviano

Mr. Laviano was petitioner's president.  He received a bachelor of science degree in accounting from St. John's University in 1977.  After graduating from college, Mr. Laviano worked for Semi-Specialists of America, Inc. (SAI), one of the largest and most profitable semiconductor brokerages in the nation.  SAI was an electronics business that functioned as a middleman for computer chips and other electronic components, much as petitioner did.  Mr. Laviano worked for SAI for approximately 1 year.  While he was employed there, Mr. Laviano learned SAI's business well enough to go into the business for himself.  During the year in issue, Mr. Laviano worked for petitioner approximately 60 to 80 hours per week, 52 weeks per year.  Mr. Laviano was a devoted workaholic who was committed to petitioner's business and success.

b.  Mr. Woll

Mr. Woll was petitioner's secretary and treasurer.  He graduated from Yale University, cum laude, in 1977, receiving his bachelor of arts degree in economics and political science. After graduating from college, Mr. Woll worked on Wall Street as a trader in U.S. Treasury securities, first for A.G. Becker, Inc., for about 1 year, and then for First International Money Markets. At A.G. Becker, Inc., he placed third on its list of top salesmen for the month in which he left.  Mr. Woll also did very well at First International Money Markets.  He left First International Money Markets in September 1979 to organize Components with Mr. Laviano.  During the year in issue, Mr. Woll worked for petitioner approximately 50 to 80 hours per week.  Like Mr. Laviano, Mr. Woll was a devoted employee who was totally dedicated and committed to petitioner's business and its success.

c.  The Officers' Duties

The Officers were involved in every aspect of petitioner's business.  They performed all of its executive and managerial functions, oversaw all of its employees, and were directly responsible for its success.  The Officers served as co-chief traders, overseeing all of petitioner's purchases and sales and approving all of its deals.  The Officers bought and sold parts for petitioner, quoted all of its prices, and supervised all of

its traders.  The Officers recruited, interviewed, hired, and trained petitioner's employees.

The Officers also were petitioner's executive officers and managers.  They were directly responsible for profit maximization, long-term business planning, office automation, cash management, physical plant expansion, marketing, and all other management functions.  When not trading, Mr. Woll focused on administrative functions and was in charge of cash disbursements, cash receipts, billing, receivables, and investigating credit.  Mr. Woll also dealt with petitioner's accountants, lawyers, and bankers, and he supervised petitioner's bookkeeping staff.  The Officers supervised the shipping staff, and they personally inspected every part received by petitioner in order to ensure that the parts were not counterfeit or defective.

3.  Petitioner's Operations

For the 3-year period ended with the year in issue, petitioner's gross receipts (net of returns and allowances), gross income, book income, taxable income, Officers' compensation, Officers' compensation percentages, and Officers' equity were (rounded to the nearest dollar):

| Taxable Year Ended July 31 | Gross Receipts (Net) | Net Income Per Books | Taxable Net Income[1] | Officers' Compensation | Gross Income |
|---|---|---|---|---|---|
| 1983[2] | $2,671,061 | $88,903 | $88,903 | $26,000 | $279,158 |
| 1984 | 29,763,657 | 1,796,032 | 1,823,904 | 1,449,000 | 5,415,936 |

1985      10,693,635  3,546,647   3,546,647        2,922,000   4,830,348

[1] Before deduction of officers compensation.
[2] This year, petitioner's first, represents approximately 8 months of operation.

Officer Compensation
Percentages

| Taxable Year Ended July 31 | Officer Compensation Divided by: | | | |
| | Gross Receipts (Net) | Gross Income | Net Income Per Books | Taxable Net Income |
| --- | --- | --- | --- | --- |
| 1983 | 1.0% | 0.9% | 29.2% | 29.2% |
| 1984 | 4.9 | 26.8 | 80.7 | 79.4 |
| 1985 | 27.3 | 60.5 | 82.4 | 82.4 |

As of the end of these 3 years, petitioner reported the following

total assets, liabilities, and equity:

| Taxable Year Ended July 31 | Total Assets | Total Liabilities | Equity |
| --- | --- | --- | --- |
| 1983 | $116,298 | $52,395 | $63,903 |
| 1984 | 900,935 | 500,000 | 400,935 |
| 1985 | 961,032 | 450 | 960,582 |

## 4. The Officers' Compensation From Petitioner

### a. Overview

The Officers each signed an employment agreement with

petitioner that entitled each of them to $650,000 of compensation

per year.

### b. Mr. Woll's Efforts

Mr. Woll recognized that he was a minority shareholder and

he believed that, in the absence of an employment agreement,

Mr. Laviano could set Mr. Woll's compensation at any amount.

One of the Officers' first efforts to address the concerns of

Mr. Woll was to form petitioner, giving Mr. Woll a larger ownership interest. Mr. Woll continued to try to negotiate a higher salary after petitioner's formation. Mr. Laviano, on the other hand, wanted to limit the amount Mr. Woll was paid. Mr. Woll never threatened to leave the employment of petitioner if his compensation was not increased, but he constantly tried to convince Mr. Laviano to increase his compensation. One of the ways Mr. Woll attempted to convince Mr. Laviano to increase his compensation was to report to Mr. Laviano his estimate of what executives in other firms in petitioner's industry were making. Most of the information upon which Mr. Woll based his estimate was obtained from the owners of companies that competed with petitioner.

After much discussion among themselves, the Officers agreed to set their salaries at $650,000 a year for 3 years, beginning on November 5, 1982. In doing so, the Officers considered what they understood other people in petitioner's industry were making. They considered that they would be acting as chief traders, as well as managers and executives. They discussed whether they should receive commissions, but decided to work strictly on a salary basis. In agreeing to set their compensation at a fixed annual rate, the Officers did so with the understanding that it might not be possible for petitioner to pay them $650,000 each year due to the cyclical nature of its

industry, and that any underpayment in a year would be made up when petitioner had the available resources.[3]

On November 1, 1982, petitioner's board of directors met and resolved that the "compensation for the next three (3) years for Mr. Peter Woll and Mr. Thomas Laviano, should be set at $650,000 per year."[4]

c. Amounts Claimed by Petitioner as Officers' Compensation

The Officers served as officers of petitioner during each of its taxable years ended July 31, 1983, through July 31, 1985.

---

[3] Par. 4(e) of the principal officer employment agreements states:

during some fiscal years of the Corporation, available cash may not allow compensation of the Employee to the extent of immediate and long term effects of his efforts upon the profitability of the Corporation.

\* \* \* \* \* \* \*

it is acknowledged between the Employee and the Corporation that full compensation for all Employee's services may not be possible, from a cash standpoint during years in which there has been a downturn or recession in the semiconductor market. Therefore, the Corporation shall, in setting compensation for the Employee in later more profitable fiscal periods, take into account previously uncompensated services arising at former, less profitable years. \* \* \*

[4] Petitioner's contracts with the Officers also entitled them to benefits including: (1) Automobiles (2) financial counseling, (3) disability benefits, (4) any benefits (including pension, retirement, profit sharing, insurance, and medical benefits) provided by petitioner to its employees in general, (5) apartments and vacation condominiums, (6) reimbursement for expenses incurred on behalf of petitioner, and (7) reimbursement for club dues and expenses.

Petitioner deducted the following Officers' compensation on its Federal corporate income tax returns for those years as follows:

| Taxable Year Ended July 31 | Deduction Claimed | | |
|---|---|---|---|
| | Mr. Laviano | Mr. Woll | Total |
| 1983 | $11,000 | $15,000 | $26,000 |
| 1984 | 729,000 | 720,000 | 1,449,000 |
| 1985 | 1,461,000 | 1,461,000 | 2,922,000 |
| Total | 2,201,000 | 2,196,000 | 4,397,000 |

A comparison of the Officers' compensation and their stock ownership interests is as follows:

| Taxable Year Ended July 31 | Mr. Laviano (55%) | Mr. Woll (40%) |
|---|---|---|
| 1983 | 42.3% | 57.7% |
| 1984 | 50.3 | 49.7 |
| 1985 | 50.0 | 50.0 |

d.  Board Resolution Concerning Undercompensation

Petitioner's board met on August 6, 1984, and reported that each of the Officers was actually paid less than the amounts that were fixed in their employment agreements.  Specifically, the board found, the Officers were entitled to receive $650,000 per year, but were actually paid the following amounts:

| | 1983 | 1984 |
|---|---|---|
| Thomas Laviano | $11,000 | $729,000 |
| Peter Woll | 15,000 | 720,000 |

The board decided that petitioner owed Mr. Laviano $560,000 and that petitioner owed Mr. Woll $565,000.  The board unanimously

decided that petitioner would pay these debts in the taxable year ended July 31, 1985.

5. Petitioner's Employees

Petitioner employed many individuals to buy and sell electronic components. Most of petitioner's employees did not have prior experience in the electronics industry before they commenced their employment with petitioner. The Officers taught petitioner's new employees to be traders by sitting next to them, having the new employees watch them, and answering the new employees' questions. After a while, the new employees were given simple tasks to do on their own, and if they performed those tasks correctly, the new employees were given a few well-established accounts to manage in order to develop their trading skills. From 1980 through 1984, approximately eight individuals terminated their employment with petitioner (or Components) in order to start a competing businesses.

Petitioner also employed several individuals to support its sales and purchasing operations. Petitioner's support staff ranged from one to three employees in the shipping and receiving department, one to two secretaries, a bookkeeper, and an individual to perform administrative functions.

a. Compensation of Petitioner's Employees

Petitioner generally paid its employees a rate of compensation which the Officers thought was commensurate with

each employee's skill and experience and, particularly due to the fierce competition in petitioner's industry, what the Officers believed it would take to hire and retain the employee. Petitioner's compensation package differed depending upon whether the employee was a member of petitioner's sales and purchasing staff or its administrative or support staff. Petitioner, unlike Components, did not have a pension plan. The only benefits that petitioner provided to its employees were paid vacations and, beginning in the year in issue, medical insurance.

Petitioner's sales and purchasing staff received a base salary plus commissions for sales greater than monthly sales quotas. They did not receive any other bonuses. Their commissions ranged from 2 to 15 percent, and the average commission was 10 percent of the gross profits from the transactions consummated by the employee. Commissions were the bulk of the annual compensation received by sales or purchasing agents.[5] During the 1984 and 1985 calendar years, petitioner paid its sales and purchasing employees the following amounts:

---

[5] Consequently, such employees' annual compensation varied greatly depending on the economic conditions in petitioner's industry. In periods of high profitability, many of petitioner's sales personnel were highly compensated, earning in excess of $100,000. In more fallow periods, petitioner's sales personnel earned only a fraction of that amount.

| Employee | 1984 | 1985 | Total |
|---|---|---|---|
| John Laviano[1] | $515,397 | $196,000 | $711,397 |
| Michael Lavelle | 263,764 | 148,000 | 411,764 |
| Kenneth Forster | 172,004 | 34,695 | 206,699 |
| Ginny Neitzel | 105,139 | 38,199 | 143,338 |
| Lee Ackerly[2] | 138,319 | -0- | 138,319 |

[1]John Laviano, received commissions based on 15 percent of the gross profits from the transactions in which he was involved.
[2]Lee Ackerley left the petitioner during 1984 to start a competing business.

Petitioner paid its support staff a salary and occasional monthly bonuses depending on petitioner's profitability. No bonuses were paid during periods of low profitability. During periods of high profitability, bonuses were mediocre and were paid with an intent to permit petitioner's support personnel to participate in its profits.

6. Petitioner's Retained Earnings and Dividend Policy

Petitioner retained earnings for the 3-year period ended July 31, 1985, were as follows:

| Taxable Year Ended July 31 | Retained Earnings |
|---|---|
| 1983 | $62,903 |
| 1984 | 399,935 |
| 1985 | 959,582 |

During these years, petitioner paid the following dividends:[6]

| Taxable Year Ended July 31 | Dividends | | |
| --- | --- | --- | --- |
| | Mr. Laviano | Mr. Woll | John Laviano |
| 1983 | -0- | -0- | -0- |
| 1984 | $5,500 | $4,000 | $500 |
| 1985 | 35,750 | 26,000 | 3,250 |
| Total | 41,250 | 30,000 | 3,750 |

Petitioner's retained earnings increased by approximately 1,525 percent from $62,903 on July 31, 1983, to $959,582 on July 31, 1985. Its shareholder's equity increased by 1,503 percent from $63,903 on July 31, 1983, to $960,582 on July 31, 1985. Even though petitioner had a cash surplus on July 31, 1985, petitioner was retaining these funds for business reasons.

7. The Officers' Other Entities

The Officers, jointly or individually, were engaged in other activities aside from their interest in petitioner. They were equal partners in a partnership that was formed to increase their market share in petitioner's industry, and to allow for volume discounts on purchases.

Petitioner used the services of the other entities that were entirely owned by the Officers. Services performed by these other entities included financial, marketing, and management consulting. Petitioner, through the Officers, devoted some of

---

[6] Components paid dividends of $12,500 in its taxable year ended Nov. 30, 1980, and $8,000 in its taxable year ended Nov. 30, 1981.

its time to (and performed services on behalf of) the operations of these other entities.

OPINION

Once again, we are faced with perhaps one of the most litigated issues in Federal income taxation, the deductibility of compensation paid to shareholders/employees in the setting of a closely held corporation.  In order for employee compensation to be deductible by a cash method taxpayer, the compensation must be:  (1) Paid in the taxable year for services rendered to the taxpayer in the conduct of its trade or business, (2) reasonable in amount, and (3) ordinary and necessary in character.  Sec. 162(a)(1); Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282; sec. 1.162-7(a), Income Tax Regs.  While each criterion may be at issue from time to time, it is the reasonableness standard that presents the most difficult issue.  As the Court has observed:

> Inherently there is a natural tension between:
> (1) Shareholders/employees who feel that they are entitled to
> be paid from a corporation's profits, even to the exhaustion
> thereof, of an amount that reflects their skills and efforts,
> and (2) a provision in the tax law that conditions the
> deductibility of compensation on the concept of
> reasonableness.  What is reasonable to the
> entrepreneur/employee often may not be to the tax collector.
> * * * The term "reasonable", however, must reflect the
> intrinsic value of employees in the broadest and most
> comprehensive sense.  [Mad Auto Wrecking, Inc. v.
> Commissioner, T.C. Memo. 1995-153.]

The parties do not dispute that the Officers' compensation was an ordinary and necessary expense of petitioner.  Thus, we

assume it was, and we limit our discussion to the other two prongs, and we pass on these prongs seriatim.

## 1.  Whether the Compensation Paid by Petitioner Was Reasonable

### a. Overview

Reasonable compensation is determined by comparing the compensation paid to an employee with the value of the services that he or she performed in return.  Such a determination is made with respect to each employee individually, rather than with respect to the compensation paid to all employees collectively. Such a determination is a question of fact.  RTS Inv. Corp. v. Commissioner, 877 F.2d 647, 650 (8th Cir. 1989), affg. per curiam T.C. Memo. 1987-98; Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).  Respondent's determination is presumed correct, and petitioner must prove it wrong.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); RTS Inv. Corp. v. Commissioner, supra at 650.

The cases concerning reasonable compensation are legion and list many factors to be considered in making this factual determination.  The factors which may be considered, none of which is controlling in itself, include:  (a) The employee's

qualifications; (b) the nature, extent, and scope of the employee's work; (c) the size and complexities of the employer's business; (d) a comparison of salaries paid with the employer's gross and net income; (e) the prevailing general economic conditions; (f) a comparison of salaries with distributions to Officers and retained earnings; (g) the prevailing rates of compensation for comparable positions in comparable concerns; (h) the salary policy of the employer as to all employees; (i) the amount of compensation paid to the particular employee in previous years; (j) the employer's financial condition; (k) whether the employer and employee dealt at arm's length; (l) whether the employee guaranteed the employer's debt; (m) whether the employer offered a pension plan or profit-sharing plan to its employees; and (n) whether the employee was reimbursed by the employer for business expenses that the employee paid personally.  See Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Elliotts, Inc. v. Commissioner, supra at 1245-1248; Kennedy v. Commissioner, 671 F.2d 167, 174 (6th Cir. 1982), revg. and remanding 72 T.C. 793 (1979); Charles Schneider & Co. v. Commissioner, supra at 151-152; Mayson Manufacturing Co. v. Commissioner, supra at 119; Estate of Wallace v. Commissioner, supra at 553; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155-1156 (1980); see also Mad Auto Wrecking, Inc.

v. Commissioner, supra.  In analyzing these factors, the Court must carefully scrutinize the facts of a case in which the paying corporation is controlled by the employees to whom the compensation is paid.  In such a situation, we must be convinced that the purported compensation was paid for services rendered by the employees as opposed to a distribution of earnings to them that the payor could not deduct.  RTS Inv. Corp. v. Commissioner, supra at 650; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315-316 (8th Cir. 1975), affg. T.C. Memo. 1974-44; Charles Schneider & Co. v. Commissioner, supra at 152-153; Seven Canal Place Corp. v. Commissioner, 332 F.2d 899 (2d Cir. 1964), remanding T.C. Memo. 1962-307.

b.  Employee's Qualifications

An employee's superior qualifications for his or her position with the business may justify high compensation.  See, e.g., Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338, 352-353 (1972).

The Officers are exceptionally qualified for petitioner's business, by virtue of their education, training, experience, and dedication.  They understand and control every aspect of petitioner's operations.  They are highly motivated and extremely productive employees.  They are the primary reason for petitioner's success.  The Officers' outstanding qualifications

justify high compensation.  Petitioner's profitability, which rests upon its sales, and the Officers' ambition, inventiveness, and energy (as opposed to petitioner's investment in capital) are the primary reasons for petitioner's sales, growth, and success. See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra at 352-353.  This factor favors petitioner.

c.  Nature, Extent, and Scope of the Employee's Work

An employee's position, hours worked, duties performed, and general importance to the success of a business may justify high compensation.  Elliotts, Inc. v. Commissioner, 716 F.2d at 1245-1246; American Foundry v. Commissioner, 536 F.2d 289, 291-292 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972); Mayson Manufacturing Co. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158.

The Officers performed all of petitioner's executive and managerial functions.  They performed or oversaw virtually all of its trading activities.  They supervised its daily operations, including supervising and directing its employees, and they made its business decisions.  Given the vital role played by the Officers in petitioner's operations and success, and the long hours that they each dedicated thereto, we view the Officers as indispensable to petitioner's business.  Petitioner's growth and prosperity are due directly to their skills, dedication, and

creativity.  This factor favors petitioner.  See Elliotts, Inc.
v. Commissioner, supra at 1245-1246; Kennedy v. Commissioner,
supra at 176; Home Interiors & Gifts, Inc. v. Commissioner, supra
at 1158; Dave Fischbein Manufacturing Co. v. Commissioner, supra
at 352-353.

### d.  Size and Complexities of the Employer's Business

Courts have considered the size and complexity of a
taxpayer's business in deciding whether compensation is
reasonable.  Elliotts, Inc. v. Commissioner, supra at 1246;
Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179
(10th Cir. 1975), affg. 61 T.C. 564 (1974); Mayson Manufacturing
Co. v. Commissioner, 178 F.2d at 119.

Petitioner is a highly specialized semiconductor trading
company, and its split-second trading operations demand
expertise.  Petitioner's business is highly competitive, with
thousands of competitors trying to locate and sell the same parts
as petitioner.  Petitioner's unique trading method introduced by
the Officers enabled it to survive and become extremely
profitable in a highly competitive industry.  Petitioner's gross
receipts during the year in issue totaled more than $10 million.
This factor favors petitioner.  See Elliotts, Inc. v.
Commissioner, supra at 1246.

### e.  Comparison of Salaries Paid to Net and Gross Income

Courts have compared sales, net income, and capital value to amounts of compensation in deciding whether compensation is reasonable.  Elliotts, Inc. v. Commissioner, supra at 1241; Mayson Manufacturing v. Commissioner, supra.

For the year in issue, Officers' salaries were 27.3 percent of gross receipts and 60.5 percent of gross income.  Officers' salaries were 82.4 of book net income (before deducting Officers' compensation) and 82.4 percent of taxable net income (before deducting Officers' compensation).

These percentages are reasonable in light of the qualifications of the Officers and the nature, extent, and scope of their work, and the years of prior undercompensation.  During 1983, petitioner paid the Officers less compensation than they were entitled to, while they helped petitioner increase its gross sales from $2,671,061 in 1983 to $10,693,635 in 1985.  We also find relevant the fact that petitioner reported more than $995,460 in taxable income during the subject year, notwithstanding its payment of large compensation to the Officers.  This factor favors petitioner.

f.  General Economic Conditions

This factor helps to determine whether the success of a business is attributable to general economic conditions, as opposed to the efforts and business acumen of the employees.  General economic conditions may affect a business' performance

and indicate the extent (if any) of the employees effect on the company.  Mayson Manufacturing Co. v. Commissioner, supra at 119-120.  Adverse economic conditions, for example, tend to show that an employee's skill was important to a company that grew during the bad years.

Because petitioner's industry seeks to take advantage of supply imbalances present in the computer chip/semiconductor market, it is characterized by periods of rapid growth and profitability followed by periods of sharp decline.  Petitioner faced declining sales during the subject year as market imbalances in supply began to correct themselves, and petitioner was forced to compete with an increasing number of competitors.  Although petitioner's gross receipts declined significantly, petitioner experienced an increase in its taxable income, retained earnings, and shareholder's equity.  The adverse economic conditions tend to show that the Officers' skill and diligence were important to petitioner's success.  This factor favors petitioner.

### g.  Comparison of Salaries With Distributions to Officers and Retained Earnings

The failure to pay more than minimal dividends may suggest that reported compensation actually is (in whole or in part) a dividend.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Charles Schneider & Co. v. Commissioner, 500 F.2d at 151.

Corporations, however, are not required to pay dividends. Shareholders may be equally content with the appreciation of their stock caused, for example, by the retention of earnings. Owensby & Kritikos, Inc. v. Commissioner, supra; Elliotts, Inc. v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1162 (1980).

Petitioner has a history of regularly declaring and paying dividends. In reviewing the reasonableness of an employee's compensation, we often apply a hypothetical independent investor standard to determine whether a shareholder has received a fair return on investment after the payment of the compensation in question. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; Elliotts, Inc. v. Commissioner, 716 F.2d at 1244; Medina v. Commissioner, T.C. Memo. 1983-253; see also Rev. Rul. 79-8, 1979-1 C.B. 92 (compensation is not unreasonable merely because a corporation pays an insubstantial portion of its earnings as dividends). Whether to pay a dividend, and the amount thereof, were business decisions made by petitioner's board taking into account that petitioner had accumulated sufficient earnings during profitable years and that petitioner might need to retain some (or all) of those earnings in order to weather less profitable periods that were likely ahead. We refuse to second-guess the board's business judgment under the facts of this case; we view its decisions concerning the payment

of dividends and the amounts thereof as reasonable business decisions.[7] Petitioner paid $65,000 in dividends in the year at issue. Its shareholder's equity grew from $63,903 on July 31, 1983, to $960,582 on July 31, 1985. Its retained earnings grew from $62,902 on July 31, 1983, to $959,582 on July 31, 1985. See Comtec Sys., Inc. v. Commissioner, T.C. Memo. 1995-4. In addition to the fact that the increase in petitioner's retained earnings most likely increased the value of its stock, we believe that a hypothetical investor would have considered $959,582 in retained earnings to have been a worthy performance for the 3-year period. Moreover, the Officers received dividends from petitioner's earnings. The dividends per share increased from $95 per share on July 31, 1984, to $617.50 per share on July 31, 1985. On this record, it is clear that an investment in petitioner's stock was very attractive and that the Officers received an adequate share of petitioner's profits through dividends. This factor favors petitioner.

h. Prevailing Rates of Compensation for Comparable Positions in Comparable Companies

Both petitioner and respondent rely on expert testimony with respect to this factor. Expert testimony is appropriate to help

---

[7] Bearing in mind that respondent has not determined that petitioner is liable for the accumulated earnings tax of sec. 531, it is possible that she would agree that the large increase in petitioner's retained earnings was necessary for the reasonable needs of petitioner's business.

the Court understand an area requiring specialized training, knowledge, or judgment.  Fed. R. Evid. 702; <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989).  The Court, however, is not bound by an expert's opinion.  We weigh an expert's testimony in light of his or her qualifications, and with respect to all credible evidence in the record.  Depending on what we believe is appropriate under the facts and circumstances of the case, we may either reject an expert's opinion in its entirety, accept it in its entirety, or accept selective portions of it.  <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 294-295 (1938); <u>Seagate Technology, Inc. & consol. Subs. v. Commissioner</u>, 102 T.C. 149, 186 (1994); <u>Parker v. Commissioner</u>, 86 T.C. 547, 562 (1986).

Petitioner's expert is Paul R. Dorf, managing director of Compensation Resources, Inc., of Upper Saddle River, New Jersey. Respondent's expert is E. James Brennan III, president of Brennan, Thomsen Associates, Inc., of Chesterfield, Missouri. Mr. Brennan is no stranger to this Court, having testified before us on no fewer than 13 prior occasions.  See <u>Alondra Indus. Ltd. v. Commissioner</u>, T.C. Memo. 1996-32; <u>Guy Schoenecker, Inc. v. Commissioner</u>, T.C. Memo. 1995-539; <u>Mad Auto Wrecking, Inc. v. Commissioner</u>, T.C. Memo. 1995-153, and the cases cited therein.

We are not persuaded by either of the experts.  Mr. Dorf's testimony was unconvincing because it did not directly address the factor at hand; i.e., the prevailing rates of compensation

for comparable positions in comparable concerns.  Considering his testimony in its entirety, we find that Mr. Dorf was retained by petitioner to advocate its position herein.  See Laureys v. Commissioner, 92 T.C. 101, 129 (1989).  We are no more convinced by Mr. Brennan.  We have had difficulty accepting Mr. Brennan's "expert" opinions in previous cases.  As in the past, we have trouble accepting his conclusions as they are not based on data from businesses that are akin to the business at hand; i.e., third-tier supply firms in the computer chip and semiconductor industry.  Restating what we have previously stated with respect to Mr. Brennan's "expert" testimony:  "We are not satisfied that a reasonable level of compensation for an executive like * * * [the Officers] can be accurately determined by reference to the industries Brennan surveyed because of the absence of significant information on other businesses similar to petitioner's." Mad Auto Wrecking, Inc. v. Commissioner, supra (quoting Thomas A. Curtis, M.D., Inc. v. Commissioner, T.C. Memo. 1994-15).  Indeed, comparing compensation paid to officers of companies that differ markedly provides guidance of dubious value.  See Diverse Indus., Inc. v. Commissioner, T.C. Memo. 1986-84; Niagara Falls Coach Lines, Inc. v. Commissioner, T.C. Memo. 1977-269.  This factor favors neither party.  We consider it neutral.

i.  Employer's Salary Policy As to All Employees

Courts have considered salaries paid to other employees of a business in deciding whether compensation is reasonable. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1159. We look to this factor to determine whether the Officers were compensated differently than petitioner's other employees merely because of the Officers' status as shareholders. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1322-1323. A reasonable, longstanding, and consistently applied compensation plan, for example, is evidence that compensation is reasonable. Elliotts, Inc. v. Commissioner, supra at 1247.

Petitioner generally offered its employees an amount that, in its board's judgment, was a competitive level of compensation designed to secure and retain employees. Petitioner paid its sales and purchasing staff a base salary, commissions, and benefits. Petitioner paid its other employees a salary, some benefits, and an occasional bonus. This factor favors neither party. We consider it neutral.

j.  Compensation Paid in Prior Years

An employer may deduct compensation paid to an employee in a year although the employee performed the services in a prior year. Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930); see also R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 50-51 (1972), and the cases cited therein. In order to do so, the employer

must show: (1) That the employer intended to compensate the employee for past undercompensation, and (2) the amount of the undercompensation. <u>Pacific Grains, Inc. v. Commissioner</u>, 399 F.2d 603, 606 (9th Cir. 1968), affg. T.C. Memo. 1967-7; <u>Estate of Wallace v. Commissioner</u>, 95 T.C. 525, 553-554 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).

Petitioner has met both of these requirements. Its board found that, during the 2-year period ended July 31, 1984, the Officers had not received $1,125,000 of the compensation provided in their employment agreements. Its board decided that petitioner would pay this liability during the year in issue. During the 2 years prior to the year in issue petitioner experienced cash-flow problems, particularly during its first year of operation, and sought to preserve its cash. Petitioner deferred the payment of some of the Officers' compensation until the year in issue. This factor favors petitioner.

k. <u>Employer's Past and Present Financial Condition</u>

Petitioner grew and became very profitable. Its equity grew from $63,903 on July 31, 1983, to $960,582 on July 31, 1985, an increase of 1,403 percent. This factor favors petitioner.

l. <u>Whether Employer and Employee Dealt at Arm's Length</u>

Where an employer and an employee are not dealing at arm's length, the amount of compensation paid may be unreasonable. <u>Owensby & Kritikos, Inc. v. Commissioner</u>, <u>supra</u> at 1324; <u>Elliotts</u>

Inc. v. Commissioner, 716 F.2d at 1246; see Gilman Paper Co. v. Commissioner, 284 F.2d 697 (2d Cir. 1960), affg. T.C. Memo. 1960-13.

Respondent argues that some of the compensation that petitioner paid to the Officers was unreasonable by virtue of the fact that some portion of their compensation exceeded the amounts fixed in their employment agreements. We disagree. While it may have been good corporate form for petitioner to have amended the employment agreements to provide for the extra compensation, such a formality is not dispositive of the realities here. Surely the compensation paid was agreed to by the Officers, and certainly the Officers were in control of petitioner and could have had petitioner approve the increase in compensation. It is not dispositive that petitioner failed to adhere to corporate formalities in setting the amount of compensation to the Officers. As the Court observed in Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 714 (1977) (quoting Reub Issacs & Co. v. Commissioner, 1 B.T.A. 45, 48 (1924)): "Closely held corporations, as is well known, often act informally, 'their decisions being made in conversations, and oftentimes recorded not in minutes, but by action.'" See id. at 713-714 (courts may give little or no weight to the lack of corporate formality in closely held corporations); Mad Auto Wrecking, Inc. v. Commissioner, T.C. Memo. 1995-153.

We find most relevant the percent of stock owned by each of the Officers in determining whether their compensation is attributable to arm's-length bargaining. Mr. Woll was a minority shareholder, and he was constantly trying to increase his ownership interest and salary. Mr. Laviano, on the other hand, was the majority shareholder. He wanted petitioner to keep cash reserves in the business for working capital. We believe that Mr. Woll bargained at arm's length with petitioner.

Given Mr. Laviano's relationship to petitioner as its controlling shareholder, we must inquire whether an independent investor would have paid Mr. Laviano the amount of compensation that he received during the subject year. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327; see also Elliotts, Inc. v. Commissioner, supra at 1246-1247. We conclude that an independent investor would have approved of the compensation paid to Mr. Laviano, in view of the nature and quality of the services that he performed for petitioner and the effect of his services on a hypothetical investor's return on investment. This factor favors petitioner.

m. Whether Employee Guaranteed Employer's Debt

Courts have considered whether an employee personally guaranteed his or her employer's debt, in determining whether the employee's compensation is reasonable. In certain situations, an employee's personal guaranty of his or her employer's debt may

entitle the employer to pay a greater salary to the employee than the employer would otherwise have paid. See Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1325 n.33; R.J. Nicoll Co. v. Commissioner, supra at 51; see also Acme Constr. Co. v. Commissioner, T.C. Memo. 1995-6; BOCA Constr. Inc. v. Commissioner, T.C. Memo. 1995-5.

The Officers guaranteed the repayment of $500,000 that petitioner borrowed from the First National Bank of Long Island on June 20, 1984. Thus, at first blush, this factor would appear to favor petitioner. We bear in mind, however, that the $500,000 proceeds were lent to the Officers by petitioner interest free, immediately after petitioner received these funds from the bank. The fact that the Officers received an interest-free loan from petitioner negates the fact that the Officers guaranteed the debt. This factor favors neither party. We consider it neutral.

n. Absence of Pension Plan/Profit-Sharing Plan

Courts have considered the absence of a pension plan or a profit-sharing plan in determining reasonable compensation. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Kennedy v. Commissioner, 671 F.2d at 174-175. Such an absence may allow the employer to pay the employee more compensation than the employer would have paid had the employer offered the employee a pension plan or a profit-sharing plan. Rutter v. Commissioner, supra at 1274.

Petitioner did not have a pension plan; thus, the Officers did not receive the benefit of any pension contributions. This factor favors petitioner.

### o.  Reimbursement of Business Expenses

Courts have considered the reimbursement of business expenses in determining reasonable compensation. An employer may pay greater compensation to an employee to reflect the fact that the employee is not being reimbursed for expenses that he or she paid on behalf of the employer. Id.

The Officers were reimbursed for their out-of-pocket expenses incurred on behalf of petitioner. The record, however, does not disclose the exact amount of these expenses. Moreover, it does not appear that any of those expenses were incurred with other than a corporate benefit in mind. This factor favors neither party. We consider it neutral.

### p.  Conclusion on Reasonableness

Most of the factors described above favor petitioner, and none of them favor respondent. We conclude that the $1,461,000 paid to Mr. Laviano in 1985 was reasonable compensation for that year. We conclude likewise with respect to the $1,461,000 paid to Mr. Woll in 1985.

### 2.  Whether Compensation Was Paid for Services Rendered to Petitioner

According to respondent, petitioner is not entitled to deduct all of the compensation paid to the Officers because it paid part of this compensation for services that they performed on account of other, related companies. We disagree. Although the Officers

provided some services to other related entities, we are unable to find that these services were performed on behalf of anyone other than petitioner.  We hold that petitioner paid the Officers the subject compensation for services that they rendered to it.

3.  Conclusion

Based on the above, we conclude that petitioner may deduct the $1,461,000 that it paid to Mr. Laviano, and it may deduct the $1,461,000 that it paid to Mr. Woll.  In so concluding, we have considered all arguments made by respondent for a contrary holding and, to the extent not discussed above, we find them to be without merit.

To reflect the foregoing,

Decision will be entered

for petitioner.